## In re B.M., Mi.R., T.R. & Me.R.

[679 A.2d 891]

No. 93-585

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 3, 1996

*Robert Appel*, Defender General, and *Anna Saxman*, Appellate Attorney, Montpelier, for Appellant Father.

*Anne Locke*, Burlington, for Appellant Grandmother.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Michael O. Duane*, Assistant Attorney General, Waterbury, for Appellee.

**Dooley, J.** The father of T.R., Mi.R. and Me.R. appeals an order of the Chittenden Family Court terminating his parental rights. The

children's maternal grandmother also appeals the order, which denied her legal custody and guardianship of T.R., Mi.R. and their brother B.M.,[1] but granted her petition as to Me.R.[2] We affirm.

We recount the facts found by the family court insofar as they are pertinent to this appeal.[3] Mother and father had been married approximately five years at the time of the termination of parental rights (TPR) hearings in February, May and June of 1993. Over those five years, the parents separated and reconciled many times, and their relationship was marked by numerous incidents of domestic violence. Most often, the father has abused the mother, but the mother has also physically abused the father. Both parents have criminal histories for assault and retail theft, and both were incarcerated for some of the time this case was pending in the family court.

In December 1991, the Vermont Department of Social and Rehabilitation Services filed a petition alleging that four-year old B.M., two-year old T.R. and eleven-month old Mi.R. were children in need of care and supervision (CHINS). The petition recounted the parents' history of criminal behavior, including the incidents of domestic violence. It alleged that the mother had a history of drug abuse, failed to properly supervise the children and abused B.M. by confining him to his room, and stated that her failure to properly supervise the children resulted in physical abuse of T.R. by B.M. and B.M.'s dangerous fire-starting behavior. SRS also alleged abuse of B.M. by the father, specifically that he had burned B.M.'s finger to teach him not to play with fire. Despite the chaos and difficulty the parents were having with the three children, they refused the services SRS offered, such as a visiting nurse, day care and Health Department services for the children. All three children were removed from the home and placed in shelter care pending the hearing on the merits of the petition.

Although the merits hearing had not been held by the following month, SRS drafted a case plan for the family. The plan called for family reunification and required the parents to undergo individual

---

[1] B.M. and his siblings have different biological fathers. The court terminated B.M.'s father's parental rights by an order subsequent to the order at issue in this appeal.

[2] The court's order explicitly grants the grandmother custody of Me.R. but does not refer to legal guardianship. At oral argument, the parties agreed that they understood the family court intended to grant legal custody and guardianship of Me.R. We agree, and by this decision clarify the order to conform to that intent.

[3] The court also terminated the parental rights of the children's mother. Although the mother filed a notice of appeal, she did not file a brief or otherwise prosecute her case in this Court. Therefore, we dismiss her appeal. See V.R.A.P. 42(b).

and joint counseling to address the father's battering and to break the cycle of domestic violence. It also required that the parents (1) make their home safe from hazards to the children, (2) supervise the children appropriately during visits, and (3) work with the home-based family services program offered by the Baird Center for Families and Children.

In late January 1992, SRS increased the parents' contact with the children from once to twice a week. In March, the mother gave birth to Me.R. Me.R. remained at home with her parents, and over the next few months, SRS scheduled overnight and weekend visits with B.M., T.R. and Mi.R. These visits were intended to facilitate family reunification, which SRS and the parties expected to take place in early May.

On May 1, 1992, the father assaulted the mother, and shortly thereafter, the parents separated. The father was arrested for the assault, but the charge was later dropped because the mother insisted that an accident, not her husband, had caused her injuries. Because of this incident, the family did not reunite as planned in May.

In mid May, Me.R. contracted salmonella poisoning and underwent surgery for an abscess in her pancreas caused by the poisoning. She was diagnosed as a "failure to thrive" infant who was underweight and lacked age-appropriate muscle development and coordination. While recovering from her illness in the hospital, Me.R. was present during another altercation between her parents. This time, the mother attacked the father and was consequently arrested. The mother's assault led SRS to file a CHINS petition on Me.R's behalf on June 1, 1992. She was released from the hospital on June 8 and placed in the care of her maternal grandmother, in whose care Me.R. remains.

Although no merits hearing had been held by June 1992, SRS convened an administrative review of the family's case plan on June 4. At the time of this review, the parents were still separated, and the father was living with his sister in Burlington. He was not in counseling because he had been suspended from a group for batterers due to the assault on his wife in May. Although the father did not attend the review, claiming that he did not receive notice, he met with the SRS caseworker soon afterward to discuss the plan. Reunification by September was the plan's new goal, and again, it called for individual counseling for the parents, temporary supervised visitation with the children and a home free of hazards for the children's return. In addition, SRS made arrangements for the family to begin working

with the Baird Center in August. The father agreed with the SRS caseworker that he would secure employment for himself and housing for the children.

In August, SRS convened another case plan review to assess the parents' progress. Neither parent attended the review, although the record shows that the father's attorney was present. It appeared that by this time the parents had reconciled and were again living together. The family's SRS caseworker discussed the plan and its goals with both parents in early September 1992. The caseworker explained that SRS would change the case plan goal to termination of parental rights if the parents did not make progress with the plan. On September 18, 1992, both parents, who were on probation at the time, were arrested for retail theft.

The merits hearing occurred on October 29, 1992. The parties admitted to the allegations contained in the CHINS petitions with some amendments. Based on the admissions, the court concluded that B.M., T.R., Mi.R., and Me.R. were CHINS because all were without proper parental care necessary for their well-being. See 33 V.S.A. § 5502(a)(12)(B).

The next month, SRS filed with the court a disposition report recommending termination of parental rights to all children. At the time SRS filed the report, the father still was not engaged in counseling for his battering behavior. The disposition report noted his failure to attend counseling consistently since the State removed the children from his care in December 1991.

The mother gave birth to another child, J.R., whose father is B.M.'s grandfather. J.R. is not part of this termination proceeding, but is in SRS custody. Since he left the hospital, he has been placed with the grandmother.

Disposition hearings for B.M., T.R., Mi.R. and Me.R. commenced in February 1993 and continued through May and June. In May, both parents were incarcerated once again. The father had pled no contest to retail theft in connection with the September 1992 arrest, simple assault on his wife in April 1993 and violation of the probation requirement that he participate in battering counseling. While incarcerated, the father participated in a violent-offender program.

In October 1993, the court issued its initial disposition order terminating the residual parental rights of both the mother and the father. It found that the father was unfit, stating that this finding was based on clear and convincing evidence. In support, the court found that the father had done "nothing to change his violent nature" and

would be unable to parent the children in a home "free of violence and upheaval." It concluded that the father would be unable to resume his parental duties within a reasonable time, noting that the father admitted he could not care for the children presently, had not completed treatment for his assaultive behavior and lacked basic parenting skills. The court pointed out that the father's situation had deteriorated during the pendency of the disposition proceeding as reflected by his repeated criminal conduct.

The court awarded custody of Me.R. to the maternal grandmother and custody of the other three children to SRS. The father has appealed the termination of his parental rights. The grandmother has appealed the failure of the court to award her custody of the other three children. Following the briefing and argument in this case, we were informed that the mother of the children has died. Although the mother's death, if it had occurred earlier, might have affected the trial court's decision, particularly with respect to the grandmother's claims, it has no direct effect on the issues before us. We must evaluate the findings based on the record before the family court and then evaluate the conclusions based on the supported findings.

## I. Father's Claims

Father first argues that the court should not have terminated his parental rights because this case does not involve egregious physical abuse that justifies termination at initial disposition. Although we agree that termination at initial disposition should be rare because it bars "all hope of family reunion," *In re D.R.*, 136 Vt. 478, 480, 392 A.2d 951, 952 (1978), we find no error here.

The polestar in disposition proceedings is the best interests of the child, considering the four criteria enumerated in 33 V.S.A. § 5540. The most important of those four factors when considering termination of parental rights is the likelihood that the parent will be able to resume parental duties within a reasonable time. *Id.* § 5540(3); see *In re J.R.*, 153 Vt. 85, 100, 570 A.2d 154, 161 (1989). We have stated that this criterion expresses "a general policy that total termination of parental rights will not be ordered in the first instance if there is a reasonable possibility that the causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time." *D.R.*, 136 Vt. at 481, 392 A.2d at 953 (construing identical provision of prior codification of same statue).

■ In this case, the court concluded that it was not likely the father would be able to resume parenting his children within a reasonable time because he had not addressed his violent behavior. We note that approximately eighteen months passed from the date the State placed the children in shelter care to the date of the last disposition hearing. SRS recommended termination of parental rights only after the father failed to make progress on the initial case plan that SRS prepared in January 1992 and reviewed in June and August that same year. While it is true that this case does not involve numerous allegations of physical cruelty to the children by their father, it is also true that the violent dynamics in the home, for which the father bore much responsibility, was a significant reason the children were placed in State custody. The chaotic and violent household contributed to the children's aggressive and dangerous behavior at the time they went into shelter care. For more than eighteen months, the father did not take advantage of the services SRS made available to him, nor has he followed through with counseling from a therapist he found on his own. Considering the significant amount of time that the father has had to ameliorate the reasons for the CHINS petition, we find no error in terminating his rights at initial disposition.

The father next claims that the evidence and the findings do not support the court's conclusion that he cannot resume his parental duties within a reasonable time, and highlights testimony that could support a contrary conclusion. He points out evidence demonstrating his interest in the children's well-being, such as calling attention to Mi.R.'s recurring diaper rash and dirty ears, buying B.M. new boots after observing him wearing two boots of the same feet during a visit, and making the home child-proof as called for by the case plan. While it would have been better for the court to make findings relevant to this evidence, see *Strong v. Strong*, 144 Vt. 44, 45-46, 472 A.2d 1245, 1246-47 (1984), we are convinced that its failure to do so is harmless. The court's conclusion is amply supported by its findings that the father had consistently neglected to address the most significant impediment to reuniting with his children — his abusive behavior toward his wife. See *J.R.*, 153 Vt. at 94, 570 A.2d at 158 (court's conclusions will stand if supported by findings).

■ The father also argues that the evidence does not support the court's conclusion that T.R. and Mi.R. have adjusted well to their foster placement. Essentially, the father challenges the weight the court afforded the parties' evidence on this issue. The trial court must

weigh the evidence, and we review only to determine if the record supports the findings. *In re M.C.P.*, 153 Vt. 275, 296, 571 A.2d 627, 638 (1989). The record supports the court's findings that the foster parents have disciplined the children appropriately and that the children's aggressive behavior has improved dramatically since being placed in their present home. Although there was conflicting testimony about how well the three older children were treated by their foster parents, it was up to the court to determine which evidence was more credible. Because the record adequately supports the findings, there was no error.

## II. Grandmother's Claims

Although we affirm the termination of the father's parental rights, we address the issues raised by the children's maternal grandmother because she was a party to the proceeding below and had petitioned the juvenile court for custody and guardianship of the children.[4]

The grandmother claims that the court erred by awarding custody and guardianship, without limitation as to adoption, of B.M., T.R., and Mi.R. to the Commissioner of SRS. Our review of the juvenile court's findings and conclusions is limited. We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them. *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

Relying on her view of the evidence, the grandmother first complains that SRS is an unsuitable legal custodian for the children because the foster parents it chose did not care for the children appropriately and the agency did not adequately address the grandmother's concerns about the placement and the children's treatment there. As with a similar argument the father advanced, we conclude that the record supports the court's findings with respect to the foster placement.

The critical findings of the court with respect to the foster parents were as follows:

---

[4]SRS moved to dismiss the grandmother's appeal, claiming that the juvenile court erroneously granted her party status. By entry order dated April 13, 1994, this Court denied SRS's motion, but permitted the parties to brief the issue. To bring finality to this fully briefed matter, we choose to decide it on the merits rather than revisiting the procedural and jurisdictional issues raised in the briefs. We expressly do not decide whether the grandmother was properly granted party status and has standing to appeal, nor do we decide whether the trial court erred by applying the best interest criteria in 33 V.S.A. § 5540 at initial disposition under 33 V.S.A. § 5528.

45. In early October, 1992, B.M., Mi.R. and T.R. were moved from the foster home they had been in since March to the home of V. and D.M. in Montpelier. The M's had been willing to work towards reunification, provide a home as long as the children needed one or to adopt all three children if the Commissioner of SRS was authorized to consent thereto.

53. When the three older children were first placed in the M. foster home in Montpelier in early October, 1992, B.M., who was then 5 years old, was nervous about his new home, T.R., who was then 3 years old, was insecure, and Mi.R., who was then 1½ years old, would occasionally have tantrums. The children were still occasionally violent towards one another, B.M. would be sulky in his mood, T.R. would often cry at night at bedtime, and Mi.R. would bite her brothers.

54. Soon the children became more peaceful, needing fewer "time outs" for their behaviors, and there was continued progress each day. Mrs. M. is an elementary school teacher and has an educational and practical background in working with children with special needs. Mr. M. has a doctorate degree in education and works at home as a professional vocational rehabilitation consultant to private companies. The M. foster home is associated with Family Life Services which is a licensed child placing agency in Vermont. They are experienced foster parents, they receive special training in providing foster care, and they have the benefit of a social worker from that agency, in addition to . . . [an SRS worker], who work in close coordination to assist them in providing care to meet the children's special needs.

57. The children are now generally well behaved because of the stability they have received in the M. home.

58. The M's have three older children who no longer live at home and are successful in their careers. They have also adopted two boys . . . who currently live with them. The M's do not and will not use physical discipline with any foster children. Mr. M. has, on rare occasions, spanked his sons for lying. Otherwise, the M's use "time out" or friendly persuasion to discipline children. As noted above, the children have generally been well behaved in their home.

63. [The grandmother] . . . would constantly complain to SRS about the care the children received and are presently receiving in their foster homes. In early 1993, SRS investi-

gated a report made by [the grandmother] . . . that B.M. and T.R. had been physically abused by Dr. M. The investigation was conducted by a person who is highly skilled in interviewing children who have reportedly been abused in school, day care, and foster care settings. The investigation revealed that not only were [the grandmother's] . . . reports unsubstantiated, but that B.M. stated he and T.R. really liked living there and Dr. M. was regarded to be an excellent foster parent. We find no credible evidence to support the claim that the M's are in any way abusive parents or are anything but loving, caring and competent foster parents. We know of no reason why they would not make a safe, secure, and supporting home for children in their care. We can find no reason why they should not be considered as adoptive parents of these or other children.

The grandmother attacks these findings of fact, emphasizing testimony that she believes shows that Dr. M. engaged in inappropriate behavior with respect to the children and shows that the SRS investigation into her charges was inadequately performed. The evidence was extensive, including testimony from the foster parents, the SRS worker and the SRS investigator, and was disputed on most of her points. Our role is limited: to determine whether the findings of the judge, who heard the testimony and resolved the conflicts, are supported by the evidence. Here, they are amply supported.[5]

The grandmother also argues that certain findings with respect to her are clearly erroneous, and the errors require reversal of the custody decision. To understand these claims, we must first summarize SRS's position on the placement of the three children, the court's view of this position and the circumstances of the grandmother.

From the beginning, SRS was most concerned about the violence observed in these very young children. The older son was setting fires and threatening the younger children with knives. The younger son was observed with a three inch bruise caused by the older son. The younger son, in turn, was physically violent to other children in a day care center. SRS workers believed that the children's violence was

---

[5] Although we have addressed this issue, we stress that the decision grants custody, and leave to consent to adoption, to SRS, not the foster parents, and the foster parents are not parties to this proceeding. The real comparison is between the grandparent and SRS, which may exercise its expertise and discretion to make any placement, including one with the grandmother.

caused by the persistent domestic violence they observed between their mother and father. They looked for a placement with a family who was skilled at eliminating the violent behavior.

For a number of reasons, SRS did not believe that the grandmother could fulfill that role. Although she was in a stable, loving relationship at the time of the hearing, she had been involved in two prior abusive relationships. Her two older children went into SRS custody, and her parental rights in those children were eventually terminated. Her daughter, the mother of the children, lived in the home while the grandmother was in an abusive relationship, and was in turn involved in an abusive relationship. The grandmother was unable to control the behavior of her daughter and had a very volatile continuing relationship with her. The grandmother would, in SRS's view, let the mother back into the lives of the children, and this would put the children in the middle of the volatile relationship. She did not understand how the children were violent, and what to do about it. SRS viewed her as overly tolerant of the violence between the mother and father, as demonstrated by her assistance in bailing him out of jail after a domestic assault. Although she believed her daughter neglected the children, in SRS's view, she did not do enough to protect them.

The family court adopted SRS's position with respect to the three older children, but left the two youngest children (one of whom is not a subject of the proceeding) with the grandmother. The main point of the court's reasoning is contained in the following findings:

> 68. [The grandmother] wants the older children as well. While we find that she would be a loving mother, and will be able to appropriately house, nurture, and care for the two young children she has, we cannot find, based on the history of upheaval in this family between [the grandmother] and [the mother], that she would be able to have all the children in her care and protect them from [the father and mother]. There is too much history, too much stress in their past, and the three older children have gone through too much violence and emotional trauma in their lives for [the grandmother] to appropriately deal with them, the two younger ones, and [the father and mother] too.
>
> 69. . . . [W]e base our decision on the probable outcome of such an arrangement. With five of [the mother's] children, it would be increasing difficult and ultimately impossible for [the grandmother] to maintain her independence from [the mother]. It will be difficult enough with one or two. Five

children are a lot to care for, and with the added burden of what everyone in this extended family has been through, the court is confident that the problems will surface to overwhelm even the best of [the grandmother's] intentions. In short, it is just not realistic to believe that all five of the children could be appropriately nurtured under the circumstances. As to the three oldest children, permanent placement with the maternal grandmother is not a workable prospect. Additionally, the guardian favors an arrangement which keeps together the three oldest children and two youngest children, but in separate households. This viewpoint is the logical choice in these circumstances.

The grandmother does not directly attack this analysis, and we find it to be supported by the evidence and within the family court's discretion. Instead, the grandmother attacks subsidiary and tangential findings and conclusions.

Again, we emphasize the limited standard of review in juvenile proceedings. Even if one or more findings is erroneous, this does not necessarily mean we will reverse the court's determination. The next step in the analysis is to determine "whether the findings that were supported by the evidence were sufficient to support the court's decision." *In re C.M.*, 157 Vt. 100, 103, 595 A.2d 293, 294 (1991). If the "remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision," we must affirm. *A.F.*, 160 Vt. at 178, 624 A.2d at 869. In this case, we believe there are adequate findings, apart from those challenged, to sustain the court's decision.

In any event, we cannot conclude any findings are clearly erroneous. Both of the challenged findings are actually conclusions of law. First, the grandmother faults the trial judge for adopting a conclusion, proposed by SRS, that there was an intergenerational cycle of violence, that the grandmother was part of it and enabled the father to be abusive. As set out above, this conclusion reflects the SRS theory of the dynamics working within the family. The grandmother had been involved in two abusive relationships, one for several years, and the mother grew up in that household. She in turn was uncontrollable and became involved in a marriage filled with domestic violence. Her children in turn displayed very violent behavior at a very young age. The theory was presented in the testimony of the SRS social worker, who was competent to give her opinion, see *In re D.C.*, 163 Vt. 517, 522, 659 A.2d 1145, 1148 (1995) (SRS social workers

competent to testify to effect of domestic violence on children, among other subjects); 33 V.S.A. § 5527(d) (in disposition hearing, "all information helpful in determining the questions presented" may be considered), and was within the discretion of the family court to adopt. It is particularly relevant to the three older children who witnessed the domestic violence, unlike the younger children.

The court went further and concluded that the grandmother's actions enabled the father's violence. This conclusion finds support in the record. Although the father had intentionally burned the oldest son with a cigarette lighter and the grandmother acknowledged he had battered the mother, the grandmother believed he had been a better parent for the children. She helped bail him out of jail, after he was arrested for assaulting the mother. The SRS social worker testified that the grandmother did not understand the source of the violent behavior of the children.

The grandmother also challenges the court's finding, again actually a conclusion of law, that she is unable to resist her daughter's demands regarding the children. We consider this conclusion because it reflected the state of the evidence in the trial court before the mother died. In any event, even if we struck this conclusion, the remaining findings and conclusions support the family court's decision.

The actual findings on this point are set out above. The court's conclusions were as follows:

> Moreover, [the grandmother and mother] have a volatile relationship which has existed for 10 years, since [the mother] was 13 years old. Their disputes now center around the children. She was completely unable to control [the mother] as a young teenager and she is even less able to control her now. Future serious conflicts between them in which the three oldest children become the unfortunate pawns are inevitable.

The point was not that the grandmother was unable to resist the mother's demands but that the children would remain in contact with both and would be caught up in their disputes. The distinction is critical because the grandmother has resisted any demands with respect to Me.R., and the court so found in placing that child with the grandmother.

We will not belabor this issue because of the death of the mother. We note that the concern about continuing post-termination involve-

ment of the parent in the lives of the children is often a strong consideration in grandparent custody cases. See, e.g., *In re S.R.*, 352 N.W.2d 141, 144 (Neb. 1984). In an analysis virtually identical to that employed by the family court here, the Missouri Court of Appeals reasoned:

> The lower court expressed concern about the relationship between the petitioners and their daughter and about possible confrontation between her and the children. The grandfather testified the daughter did not frequently visit petitioners and their relationship was not close, but he admitted she was still part of their family and would "get what she asked" from petitioners. His statements pinpoint the realities. Petitioners are not estranged from their daughter. . . . Because the termination of the mother's parental rights was involuntary and occurred during a period of her emotional upheaval, it is not unlikely she may seek contact with the twins or to regain their custody at a time when she believes stability has returned to her life. "The future welfare of the children is extremely important," and the likelihood of confrontation between the mother and her children is not mere speculation. The court must "peer into the future, to make a projection based upon the facts then before it." . . . Here, the evidence justifies the lower court's concern about prospective confrontation.

*In re B.J.K.*, 573 S.W.2d 382, 384 (Mo. Ct. App. 1978) (citations omitted); see also *In re D.L.S.*, 775 S.W.2d 548, 551 (Mo. Ct. App. 1989) (in denying post-termination custody to grandparents, court properly considered "the possibility of the mother contacting the children, and the confusion that might result to the children due to the petitioners' dual role as grandparents and parents").

Finally, the grandmother argues that it is inappropriate to separate the siblings and only she could care for all of them together. The family court considered this argument but rejected it in the circumstances before it. The five siblings have never lived together because the youngest two were born after the older three entered foster care. The grandmother is already parenting two sons of her companion, as well as the two youngest children of her daughter. During almost three years before the court decision, she had only limited contact with B.M., T.R. and Mi.R. The court concluded "[I]t is just not realistic to believe that all five of the children could be appropriately

nurtured under the circumstances." On the other hand, the three siblings were together and had bonded with the foster parents in "a stable, loving, and nurturing household."

The statute does not require that children of the same mother be kept together. Thus, we see no reason why the question does not fall within the "substantial leeway" we accord the trial court in framing a disposition order. See *In re R.S.*, 143 Vt. 565, 572, 469 A.2d 751, 755 (1983). There was no abuse of discretion.

*Appeal of the mother is dismissed. The order with respect to Me.R. is modified to transfer both legal guardianship and custody to the grandmother. In all other respects, the order of the family court is affirmed.*