2009 VT 41

**In re W.L., Juvenile**

[974 A.2d 602]

No. 08-497

¶ 1. April 15, 2009. Parents appeal the family court's order terminating their parental rights to W.L. and transferring residual parental rights to the Department for Children and Families (DCF) without limitation as to adoption. Parents argue that the court erred in denying their request to transfer their residual parental rights to W.L.'s paternal aunt and uncle. On appeal, parents contend: (1) the court lacked sufficient evidence regarding W.L.'s current circumstances to determine her best interests; and (2) the court erred in concluding that it lacked authority to fashion a shared custody arrangement between DCF and W.L.'s aunt and uncle. We affirm.

¶ 2. This termination case is somewhat unique in that parents do not challenge the court's decision to terminate their parental rights. Prior to the final hearing, parents stipulated to termination of their rights, but moved to have their residual parental rights transferred to W.L.'s aunt and uncle. At the time of the final hearing, DCF's plan on termination was to pursue adoption with W.L.'s foster mother. Therefore, the main issue at the · final hearing was whether the court should transfer the parents' residual rights to DCF or to W.L.'s aunt and uncle. W.L.'s attorney proposed a shared custody arrangement whereby legal parental responsibility would be shared, and primary physical responsibility would go to foster mother with aunt and uncle having contact. The court held a four-day hearing on DCF's petition and the parents' motion.

¶ 3. Based on the evidence, the court found the following facts. W.L. was born in January 2004. On January 14, 2005, she and her three older siblings were taken into emergency DCF custody for lack of proper parental care. The court found they were children in need of care or supervision. W.L. was placed in a foster home and has remained there ever since.

¶ 4. From the early stages, W.L.'s foster parent expressed a desire to adopt her. W.L.'s aunt and uncle also expressed a desire to have W.L. and her siblings live with them. In fact, W.L.'s two older sisters have successfully adjusted to placement in aunt and uncle's home; parental rights have been terminated with respect to both, and aunt and uncle plan to adopt them.[1] Because of their competing interest in housing and eventually adopting W.L., a tension between W.L.'s foster parent and her aunt and uncle developed. W.L.'s foster mother and her aunt "began to distrust each other and have greater difficulty cooperating regarding [W.L.]."

¶ 5. The procedural history reflects this tension and the difficulty all individuals involved in W.L.'s care have had in choosing between these two placements.[2] Initially, DCF's case plan was reunification with parents. Based on the parents' lack of progress, DCF filed a petition to terminate in January 2006. DCF withdrew

---

[1] W.L.'s brother lives with a foster family that plans to adopt him.

[2] DCF has repeatedly changed its position as to who should be considered as the prospective adoptive parent. Twice local DCF decisions have been overturned by the Commissioner's office. At the final hearing, DCF took the position that adoption by W.L.'s foster mother was in W.L.'s best interests. When the hearing was complete, DCF changed its position and indicated that it intended to pursue increased contact and adoption with aunt and uncle. Later, DCF filed a report with the court that indicated it would continue W.L.'s placement with foster mother and seek adoption by her.

the petition in October 2006 after the parents moved and began to engage in some services. The court found that this decision was contrary to W.L.'s interest given her young age, the amount of time she had already been in DCF custody, and parents' very limited progress. DCF's new case plan set a goal of reunification. At that time, aunt and uncle were not being considered as an appropriate placement for W.L.; W.L.'s older sister was placed with them and was exhibiting aggressive behavior. At a permanency hearing in June 2007, however, aunt and uncle sought increased visitation.[3]

¶ 6. DCF had two forensic evaluations done to evaluate placing W.L. with her aunt and uncle. In July 2007, Dr. Gabriel completed a report that recommended a gradual transition from foster parent to aunt and uncle, with eventual adoption. DCF then asked Mr. Kline to perform an evaluation and make recommendations regarding W.L.'s placement. He completed his evaluation in December 2007. He recommended that W.L. remain with her foster mother due to the strong bond that had formed between them. He recognized the importance of W.L.'s biological family, but explained that moving W.L. would be traumatic and very difficult due to her loss of friends, day care, therapist, and community.

¶ 7. In the fall of 2007, visits between W.L. and her sisters and aunt and uncle increased. W.L.'s foster parent reported that at the same time W.L.'s behavior changed. W.L.'s therapist and day care provider substantiated some behavioral changes in W.L., including aggression, clinginess, and toileting accidents. The court explained that it "cannot discount that what behavioral changes [W.L.] was actually experiencing in the fall of 2007 were connected to the increased visits with [aunt and uncle], but neither can the court on the state of the evidence, clearly find that to be the sole case." In February 2008, DCF filed a petition to terminate the parents' rights. Upon termination, DCF planned to pursue adoption with W.L.'s foster mother. The parents agreed to terminate their rights, but moved to have their rights transferred to aunt and uncle. W.L.'s attorney requested a shared custodial arrangement whereby W.L. would live with foster parent and have visits with aunt and uncle. Following a contested hearing, the court granted DCF's petition to terminate parents' rights and transferred those rights to DCF without limitation as to adoption, with the understanding that DCF intended to pursue adoption with foster mother. Parents appeal.

¶ 8. As we explained at the outset, the specification of issues in this appeal is unusual. This appeal is pursued by parents on behalf of aunt and uncle who are not parties and have not appealed. While we question the ability of the parents to pursue this appeal in these circumstances, we nevertheless reach the merits.

¶ 9. In a disposition proceeding, "[t]he polestar . . . is the best interests of the child." *In re B.M.*, 165 Vt. 194, 199, 679 A.2d 891, 895 (1996). In assessing the child's best interest, the court should consider:

> (1) The interaction and interrelationship of the child with his natural parents, his foster parents if any, his siblings, and any other person who may significantly affect the child's best interests;

---

[3] Aunt and uncle also sought party status, which was initially granted. However, prior to the termination proceedings at issue here, that party status was terminated. At that time, they were advised that they could seek party status once again should they believe it appropriate. No further request for party status was filed by aunt and uncle.

(2) The child's adjustment to his home, school, and community;

(3) The likelihood that the natural parent will be able to resume his parental duties within a reasonable period of time; and

(4) Whether the natural parent has played and continues to play a constructive role, including personal contact and demonstrated love and affection, in the child's welfare.

33 V.S.A. § 5540. Our review of the family court's findings and conclusions is limited. "We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them." *In re B.M.*, 165 Vt. at 201, 679 A.2d at 896.

¶ 10. The parents first argue that the family court lacked sufficient evidence regarding current circumstances to determine W.L.'s best interests. The parents claim that "DCF failed in its obligation to provide the court with expert opinions based on current information, and the court also failed in its responsibility to require such opinions."

¶ 11. We agree that the family court's findings must be based on "the current circumstances of the family." *In re C.B.*, 162 Vt. 614, 614, 644 A.2d 1294, 1295 (1994) (mem.). In demonstrating these circumstances, DCF is not, however, obligated to present expert testimony, and the court is not required to consider or base its findings on such testimony. See *In re P.F.*, 133 Vt. 64, 66, 329 A.2d 632, 634 (1974) (explaining that expert testimony was not required to support disposition order).

¶ 12. In this case, there was ample current evidence, expert and otherwise, to support the court's findings. The court considered the reports of Dr. Gabriel and Mr. Kline, and heard testimony from

them. The court properly considered Dr. Gabriel's recommendations as to placement "in light of their age." Nonetheless, the court found her to be a credible witness and determined that some of her recommendations were still helpful, including her assessment that moving W.L. to aunt and uncle's home would require a well-planned and gradual transition. Similarly, the court found Mr. Kline to be a credible witness. Again, the court could not base its decision solely on Mr. Kline's recommendation because Mr. Kline recognized that his report was based on old information and required cooperation between foster mother and aunt, but the court found Mr. Kline's assessment of W.L.'s interrelationships with foster mother and her biological family helpful. Thus, while their exact placement recommendations may not have been current, both experts provided credible evidence to support the court's findings that W.L. has a strong bond with foster parent, and transitioning W.L. would take time and would require the cooperation of both households.

¶ 13. In addition to these two experts, the court also heard testimony from people directly involved in W.L.'s care, including her therapist, daycare provider, foster parent, aunt, and three DCF caseworkers. All of these individuals provided current information about W.L. and her relationships with both foster parent and her biological family. There is no indication that the testimony was outdated, and the court did not abuse its discretion in relying on this information. Thus, we conclude that the court's findings are adequately supported by current evidence.

¶ 14. The parents next argue that the court erred as a matter of law in concluding that it lacked authority to establish some kind of shared custody arrangement between W.L.'s aunt and uncle and W.L.'s foster parent. In its decision, the family court considered the proposal of W.L.'s attorney to share custody between

the interested families. In rejecting this arrangement, the court expressed doubt as to whether such an order would be legally permissible under the statutory scheme. The court also explained that, in any event, this kind of arrangement was not in W.L.'s best interests. We do not reach the question of whether a shared custodial arrangement is permissible under the statute because we conclude that the court did not abuse its discretion in deciding that a shared arrangement was not in W.L.'s best interests.

¶ 15. All parties agree that the court was faced with a difficult decision. Foster parent has had W.L. since January 2005, has provided "a loving, supportive and committed home for [W.L.]," and is the only mother W.L. "has truly known." On the other hand, the court recognized the importance of W.L.'s bond with her biological family. The court found that W.L. was lucky to have two households "so devoted to her well-being." The court emphasized that its goal was to decide the outcome in light of W.L.'s best interests. As the court explained, "[it] must focus only on [W.L.] and regardless of how or why we have arrived at the present stage, must arrive at a decision which addresses the present reality of that stage and the needs of this young girl."

¶ 16. The court rejected a shared arrangement as not in W.L.'s best interests primarily because it would further delay permanency for W.L. The "safety and permanency of children is the paramount concern in the administration and conduct of [child protection] proceedings." 33 V.S.A. § 5501(a)(4). In this case, the need for stability and permanence was particularly pronounced given W.L.'s young age and the long period of time that had elapsed since W.L. was first taken into DCF custody. As the court noted, "[i]t is without question that a four year delay in establishing permanency for a child so young, especially when the termination of the biological parents' residual parental rights were never seriously in dispute, is unreasonable and unacceptable." A shared arrangement, with unknown further modifications, was not adequate to provide W.L. with this needed stability and permanency.

¶ 17. The court also credibly found, based on the evidence, that a shared arrangement was not a possibility given the inability of W.L.'s foster mother and her aunt and uncle to work together. The court found that the parties had not demonstrated an ability to cooperate on a joint plan. The court explained that foster mother does not trust W.L.'s aunt, and aunt and uncle resent W.L.'s foster mother for delaying contact with them. In the court's own words, the two households are not "capable of working cooperatively in order to develop a detailed, coherent plan for [W.L.] to have the best of both households in her life, an incapacity due to mistrust and case delays. This is clearly not in the best interests of [W.L.]." Because the shared custodial arrangement lacked the cooperation of the sharing households and could not provide W.L. with permanency, the court's rejection of the shared plan as not in W.L.'s best interests was not an abuse of discretion.

*Affirmed.*