*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

### ENTRY ORDER

SUPREME COURT DOCKET NO. 2010-357

JANUARY TERM, 2011

| | |
|---|---|
| In re L.B. and M.B., Juveniles } | APPEALED FROM: |

Superior Court, Lamoille Unit
Family Division

DOCKET NOS. 56/57-11-07 Lejv

Trial Judge: Dean B. Pineles

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights (TPR) with respect to his children, L.B. and M.B. We affirm.

L.B. and M.B. were born in October 2000 and August 2004, respectively. Father's mother was the primary caregiver for the children until late 2005, when she died. After that, the parents struggled to care for the children because of the parents' numerous physical and mental problems, including the mother's depression and father's mental limitations and physical ailments. In the late summer and early fall of 2006, father's sister and personnel from the children's elementary school filed complaints regarding the parents with the Department for Children and Families (DCF), alleging general neglect, poor hygiene and nutrition, a filthy home, developmental delays, truancy, lack of toilet training, and reluctance on the parents' part to seek services. The school stated that L.B. was chronically truant and was arriving at school soiled and wearing a diaper. DCF elected not to open an investigation at that time, but the following late summer and fall, DCF received further complaints from the school stating that L.B.'s clothes were soaked with urine, that her vaginal, anal, and thigh areas were excoriated as the result of poor hygiene, and that she did not know how to wipe herself. The school reported incidents in which L.B. would arrive at school without clothes, wrapped in a blanket, and screaming. Upon investigation, DCF learned of the parents' cognitive delays and their various medical and mental health issues.

In November 2007, DCF filed petitions alleging that L.B. and M.B. were children in need of care or supervision (CHINS). At the February 2008 merits hearing, the parents stipulated that, due to their limitations and the children's significant needs, they were presently unable to care for the children. Because M.B. was determined to be in need of developmental services, the whole family became eligible for an array of social services, including support coordination, respite, clinical psychiatric services, crisis support, arrangement and transportation for medical and dental appointments, skill training, and parent education. The disposition report, which was admitted at the April 2008 disposition hearing, noted that the parents had made significant progress in addressing the condition of their home and in being more receptive to services. DCF retained custody with a goal of reunification. The parents were required, among other things, to cooperate and communicate openly with DCF, to demonstrate commitment to reunification by

accepting and implementing guidance and feedback from service providers, to maintain safe and secure housing, and to work with service providers to understand their children's treatment needs and gain specific parenting skills that would allow the children to return home. Regular, supervised contact was set up.

Little had changed as of the six-month review in mid-May 2008, and the goal continued to be reunification. By the time of the permanency review hearing in November 2008, however, the situation had begun to deteriorate significantly, as the parents were not implementing the parenting skills taught by service providers. By then, the parents were having regular unsupervised visits with the children; at the same time, however, the children began to exhibit challenging behaviors that indicated a significant regression from the progress that they had made. Both children were engaging in more frequent outbursts. Father was becoming verbally aggressive and confrontational with service providers, which impeded his ability to accept feedback and follow the support plan. At the recommendation of L.B.'s therapist, visits went from unsupervised to supervised.

Because of the deteriorating situation and the passage of over one year since the children had been taken into custody, DCF changed its goal from reunification to a concurrent plan of reunification or adoption. In January 2009, DCF developed a Parent Assessment Tool that identified particular skills that the parents would have to learn to move forward towards reunification. Over the next six months, the parents followed the assessment tool and made progress in developing their parenting skills. Visits became unsupervised again in February 2009, and even included some overnights. L.B. begain showing negative reactions to father during visits, however. She did not want to have physical contact with him, and father became defensive and angry when told to give the child space and respect her wishes. In its mid-May 2009 case plan review, DCF continued to support reunification, noting the parents' continued efforts toward that end, but questioned whether the parents would be able to provide long term care for the children, given their significant needs. L.B.'s negative reactions to visits with father continued to escalate, to the point where she became very upset when he asked for hugs and kisses. Her therapist believed that her reaction stemmed from some earlier trauma, and recommended that all unsupervised visits stop.

During late 2009 and into 2010, both children demonstrated increasingly strong emotional reactions to contact with their parents, particularly father. In December 2009, DCF filed its TPR petitions. Supervised visits were reduced because of the children's increasingly severe reactions during the visits. By June 2010, the situation had reached a crisis point in terms of the children's escalating negative behavior following visits, and DCF sought termination of all visits.

The termination hearing took place over two days in August 2010. Following the hearing, the family court terminated both parents' rights. Only father has appealed. The attorney for the children joins the State's brief in opposition to father's appeal. Father argues that the evidence does not support either the family court's finding of stagnation or its conclusion that he would not be able to resume his parental duties within a reasonable period of time. Upon review of the record, we conclude that the evidence supports the court's findings and conclusions, which, in turn, support its termination order.

Father first argues that his improvement over time and his consistent commitment to his children do not support the court's conclusion that his ability to parent the children has stagnated, if not deteriorated. Father essentially asks us to reweigh evidence that amply supports the trial court's finding of stagnation, if not deterioration, in father's parenting skills. The evidence

2

demonstrates that although both parents made progress at certain periods of time during the nearly three years of the children's DCF custody, at the time of the termination hearing they were no closer to reunification than when the children first came into DCF custody. "[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." See In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.). The evidence demonstrated that father was, at times, confrontational to service providers and resistant to their feedback. The evidence also showed that father was unwilling or unable to understand his daughter's need for physical distance and her resistance to his persistent efforts to have physical contact with her. Father may have been consistent in his avowed commitment to the children, but there was no consistent improvement in his parenting skills or ability to reach the point where he could care for the children.

Father also argues that the evidence does not support the court's conclusion that he would not be able to resume parental duties within a reasonable period of time. Again, father asks this Court to weigh the evidence differently from the family court to reach a different conclusion. We decline to do so. There is ample evidence to support the trial court's conclusion that father would be unable to resume parental duties within a reasonable period of time. At the time of the termination hearing, the children had been in state custody for nearly three years. Although, as father points out, he fought off foreclosure of the parents' home and engaged in services offered to him, his progress towards reunification, as the trial court found, was sporadic and limited at best. Meanwhile, L.B. and M.B. require permanency and stability in their lives because of their tender age and high needs. Cf. In re W.L., 2009 VT 41, ¶ 16, 185 Vt. 641 (mem.) (noting young child's need for permanency after spending four years in DCF custody).

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Denise R. Johnson, Associate Justice


_____
Marilyn S. Skoglund, Associate Justice