VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    23-AP-110



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2023

In re A.P., Juvenile (E.R., Mother\*)
      }   APPEALED FROM:
      }   Superior Court, Addison Unit,
      }   Family Division
      }   CASE NO. 22-JV-00308
         Trial Judge: David R. Fenster

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in A.P. at initial disposition. We affirm.

The trial court made the following findings.  A.P. was born in June 2006 and they are the youngest of mother's three children.[1]  A.P. was the subject of child-protection proceedings in New York and removed from mother's custody in 2012.  A.P. lived with relatives in New York from 2012 to 2019.  Custody was subsequently returned to mother, and mother and A.P. moved to Vermont.  In late 2020, the State filed a petition alleging that A.P. was a child in need of care or supervision (CHINS) due to allegations of physical abuse by A.P.'s stepfather, neglect due to mother's mental health needs, and A.P.'s failure to receive the services recommended by the New York Family Court.  A.P. was taken into the emergency custody of the Department for Children and Families (DCF) and mother stipulated that A.P. was CHINS.  A.P. was eventually returned to mother's custody in August 2021 and the case was closed.

In February 2022, A.P. expressed concern about harming themself to a clinician and psychiatrist on a video call.  Although mother was home at the time, she did not appropriately respond to A.P.'s statements.  The clinician immediately drove to A.P.'s residence where A.P. had cut themself severely enough to require medical attention.  A.P. was transported to the emergency room by ambulance.  Mother did not respond to A.P.'s emotional or medical needs and did not prevent A.P. from cutting themself.  A.P. was discharged from the emergency room to the Northeastern Family Institute Hospital Diversion program.  During a discharge meeting with a clinician, mother was experiencing an extended manic episode.  Mother was disorganized in her thinking and erratic in her interactions with others.  Mother did not recognize A.P.'s need for a safety plan before discharge.  Mother removed A.P. from the program after only five days, much earlier than recommended.

---

[1]  A.P. uses the pronouns they/them.

That month, the State filed a petition alleging that A.P. was CHINS and A.P. was placed in DCF custody. Between March 2022 and July 2022, DCF attempted to work with mother toward reunification with A.P. DCF tried to communicate with mother about action steps necessary to achieve reunification, but mother could not focus on A.P. or address A.P.'s needs during her communications with DCF. Mother did not abide by DCF's expectations regarding her contact with A.P. Mother inundated A.P. daily with text messages, emails, and phone calls. Mother also shared personal information about A.P. with numerous individuals, including strangers; mother would copy A.P. on many of these messages. She accessed A.P.'s social media accounts and shared information from the accounts with strangers. A.P. felt violated by mother's actions and mother's behavior had a negative impact on A.P.'s mental health.

In May 2022, the court issued a juvenile protective order to protect A.P. from mother. Mother nonetheless continued to contact A.P. With one minor exception, A.P. had no in-person contact with mother after February 2022. The one in-person contact began well but mother then became agitated, and ultimately A.P. wanted to leave without further contact with mother. A.P. initially had phone contact with mother but mother's phone calls became overwhelming for A.P. and had a negative impact on their mental health. As a result, in April 2022, mother's phone contact with A.P. was required to be conducted in the presence of a support person for A.P. Since then, A.P. changed their phone number and did not want contact with mother.

The court found A.P. to be CHINS in a July 2022 order and it adopted the CHINS findings in its termination order. At the time the CHINS petition was filed, A.P. was in a serious mental-health crisis as evidenced by serial incidents of self-harm requiring hospitalization and intensive follow-up care. A.P. was in mother's care and mother's mental health had taken a dramatic turn for the worse, rendering mother unable to focus on A.P.'s needs. Mother could not focus on anything in a coherent, rational way. Mother could not effectively communicate with A.P.'s service providers given her lack of focus and the fact that she was sending numerous messages to them in very short timeframe. While mother loved A.P., the court found A.P. at risk of harm and experiencing harm at the time of the petition due to mother's declining mental health and resulting inability to provide A.P. with reasonable care.

The initial disposition case plan called for Another Planned Permanent Living Arrangement (APPLA). A.P. initially wanted the APPLA case plan because they wanted a relationship with mother. In October 2022, however, DCF amended the disposition case plan goal to adoption given mother's failure to make progress in meeting any of the case plan goals, A.P.'s need for permanence, and A.P.'s desire to be adopted.

A.P. was almost seventeen years old at the time of the trial court's termination decision in March 2023. A.P. had been in the same foster placement since June 2022 and was doing very well there. A.P. had not engaged in any self-harm since entering DCF custody. A.P.'s foster parents were very supportive.

The court found that A.P. needed a custodian who was emotionally in tune with their needs. A.P. had experienced physical abuse, sexual abuse, neglect, and disrupted attachment. During A.P.'s prior placement in DCF custody, A.P. was identified as a high risk for suicide given the severity of their attempts at self-harm. A.P.'s foster parents had been providing appropriate support and safety planning for A.P. when required.

The court considered the statutory best-interests factors and concluded that they all supported termination of mother's rights. As to the most important factor, the court found that mother could not resume her parental duties within a reasonable time. The court found little change in mother's conduct since A.P. was taken into custody in February 2022. Mother

remained preoccupied with her own needs and unable to focus on A.P.'s needs. A.P.'s specific need for safety and stability made mother's parental shortcomings even more significant. The court added that mother had been unable to parent A.P. for long periods of time in the past. It noted that DCF had attempted to engage mother in case planning with a goal of reunification. While mother had been consistently engaged with her counselor, mother could not work with DCF, other team members, or A.P.'s service providers given her inability to focus on A.P. In evaluating what constituted a reasonable time from A.P.'s perspective, the court also considered that A.P. would turn eighteen years old in fifteen months. It found that A.P. had a high need for stability and permanence while mother had a short window in which to be able to resume parenting. Given this history and mother's current conduct, the court found no likelihood that mother could resume parental duties within a reasonable time. For this and other reasons, the court concluded that termination of mother's rights was in A.P.'s best interests. This appeal followed.

Mother argues that the court erred in terminating her rights at initial disposition. She challenges the court's assessment of the evidence with respect to the statutory best-interests factors. According to mother, there was evidence to show that she could resume parenting A.P. within a reasonable time and she notes that she was able to regain custody of A.P. in the past. She contends that she should have been given more time to improve.[2] Mother references evidence that she believes supports a different outcome. Mother also argues that the court should not have cited her inability to engage in case planning with DCF in reaching its conclusion because she was never required to comply with a court-adopted case plan.

We find no error in the court's decision to terminate mother's rights at initial disposition. "The polestar in disposition proceedings is the best interests of the child" and the court must consider the factors set forth by statute in reaching its conclusion. In re B.M., 165 Vt. 194, 199 (1996) (mem.); see also 33 V.S.A. § 5114. The most important factor "is the likelihood that the parent will be able to resume parental duties within a reasonable time." Id. "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citations omitted). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.).

The court applied the appropriate standard and its conclusions are supported by its findings, which are in turn supported by the record. As to the most important factor, the court determined that mother made little progress in modifying her behavior since A.P. was taken into DCF custody in February 2022. She continued to lack the ability to focus on A.P.'s needs. The court did not terminate mother's rights based on her failure to meet expectations in the case plan, as mother suggests. It reasonably considered that mother's lack of focus rendered her unable to work with DCF and A.P.'s service providers in case planning efforts. Mother's behavior after A.P. was placed in DCF custody was relevant to the court's best-interests analysis, even if no case plan had yet been adopted. See In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325 (recognizing that,

---

[2] To the extent that mother contends that her due process rights were violated by the termination of her rights at initial disposition, she fails to show that she raised this argument below; the argument is also inadequately briefed. We thus do not address this argument. See, e.g., Johnson v. Johnson, 158 Vt. 160, 164 n.* (1992) (explaining that Supreme Court will not address contentions so inadequately briefed as to fail to minimally meet standards of V.R.A.P. 28(a)).

in considering if parent can resume parental duties, "court must consider a parent's prospective ability to parent the child" and "past events are relevant in this analysis" (quotation omitted)); see also In re H.T., 2020 VT 3, ¶ 29, 211 Vt. 476 (concluding that "absence of an approved case plan . . . did not create notice issues for parents" as termination order was not based on failure to meet expectations in case plan but was instead based on conclusion "that the parents would not likely be able to resume parenting responsibilities in a reasonable time because of their failure to improve over the course of more than two years despite extensive DCF support"). We reject the argument that mother lacked notice as to what was expected of her.

In reaching its conclusion, the court also cited A.P.'s great need for stability and the short time in which mother had in which to gain the skills necessary to parent them. The court made numerous other findings with respect to the remaining statutory factors, including factors for which mother's inability to engage with DCF and service providers was also relevant, none of which mother challenges as clearly erroneous.

Mother essentially challenges the trial court's assessment of the evidence. We leave it to the trial court, as factfinder, to weigh the evidence and assess the credibility of witnesses. In re A.F., 160 Vt. 175, 178 (1993). Mother's disagreement with the court's conclusions does not demonstrate an abuse of discretion. Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571, 980 A.2d 799 (mem.) (explaining that arguments which "amount to nothing more than a disagreement with court's reasoning and conclusion" do not make out case for abuse of discretion). We find no basis to disturb the court's decision.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice