NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 3

No. 2019-282

| In re H.T. & M.L., Juveniles | Supreme Court |
| --- | --- |
| | On Appeal from |
| | Superior Court, Windham Unit, |
| | Family Division |
| | |
| | December Term, 2019 |

Katherine A. Hayes, J.

Sarah Star, Middlebury, for Appellant Father.

Michael Rose, St. Albans, for Appellant Mother.

Allison N. Fulcher of Martin & Delaney Law Group, Barre, for Appellees Juveniles.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Martha E. Csala, Assistant Attorney
  General, Waterbury, for Appellee Department for Children and Families.


PRESENT: Reiber, C.J., Robinson and Eaton, JJ., and Grearson, Supr. J. and
        Morris, Supr. J. (Ret.), Specially Assigned


¶ 1.    **EATON, J.** Parents appeal from the termination of their rights in M.L., born in 2014, and H.T., born in 2015, following a long-delayed initial disposition hearing. They argue that: the court committed plain error in accepting their stipulation that the children were in need of care or supervision (CHINS); their due process rights were violated by delays in the proceedings; and the court erred in concluding that they would not be able to parent the children within a reasonable time. We affirm.

¶ 2. The Department for Children and Families (DCF) has been involved with the family since 2014, when it obtained custody of M.L. and an older half-sibling, A.L.[1] M.L., then two months old, had bruises on her face, and A.L., then two-and-a-half, cut himself with a razor due to inadequate supervision. M.L. was returned to parents' custody in April 2015 and H.T. was born three months later.

¶ 3. In July 2016, DCF filed a petition alleging that H.T. and M.L. were CHINS. Following a temporary-care hearing, the children were taken into temporary DCF custody. The court issued a written temporary-care order (TCO) in September 2016. Because this order forms the basis of the CHINS determination, we set forth the findings in detail. The findings were made by clear and convincing evidence unless otherwise noted and they were based on nonhearsay unless otherwise stated.

¶ 4. The findings reflect the following. Sometime after April 2015, when M.L. was returned to parents' care, she began exhibiting concerning behavior at preschool. She would scream and cry multiple times a week in ways that differentiated her from the other children. The court found by a preponderance of the evidence that there was a correlation between M.L.'s return to parents' home and her concerning behavior. The preschool teacher met with parents in May 2016 and parents agreed that M.L. should have a mental-health assessment. The teacher subsequently observed scratches on M.L. and what looked like a rug burn on her inner thighs. The teacher contacted DCF about the latter condition. The court found it more likely than not that M.L.'s rash was the product of at least minor neglect.

¶ 5. A.L. was in DCF custody at the time of the temporary-care order. See 33 V.S.A. § 5308(c) (stating that in temporary-care proceeding, court "shall consider orders and findings

_____

[1] A.L. is mother's, but not father's, biological son. Mother's rights in A.L. were terminated, a decision we recently affirmed on appeal. See In re A.L., No. 2019-220, 2019 WL 6050048 (Vt. Nov. 14, 2019) (unpub. mem.), https://www.vermontjudiciary.org/opinions-decisions [https://perma.cc/E53D-VX84].

from other proceedings relating to the custody of . . . the child's siblings"). The court found that when A.L. came into DCF custody, his behavior was out of control. He was hurting other people and hurting animals. His behavior improved in foster care. The court found by a preponderance of the evidence that his behavior improved because he was removed from mother's care. Mother was not in control during supervised visits with A.L. Her home was chronically unclean; a DCF employee who brought A.L. for a visit observed dog feces on the floor, old food stuck to a highchair, and trash strewn all over H.T.'s room. There were piles of dirty dishes and three bags of trash in the children's bedroom. Father saw no issue with the home's condition, which the court found troubling.

¶ 6. The TCO noted that DCF had been involved with the family for five years and provided the parties with extensive support, including Family Time coaching, Nurturing Parents group, financial support, daycare, early education, counseling, and regular treatment-team meetings. In terms of custody, the court found it difficult to determine what additional services DCF could provide to parents to keep the children in the home.

¶ 7. The TCO court also admitted several exhibits provided by the State. One was an affidavit containing hearsay that the court deemed reliable. Based on the affidavit, the court made the following findings by a preponderance of the evidence. In late May 2016, a visit supervisor tried to reach mother for almost four hours to confirm a visit with A.L. Mother was home alone with H.T., who was then ten months old. Mother was sleeping in the middle of the day. When the supervisor arrived with A.L., there were dirty dishes piled on the stove, sink, and freezer, and clothes were strewn around the house. H.T. had not eaten lunch by 2:00 p.m. and mother initially fed him Goldfish crackers. Around the same time, M.L. arrived at preschool with scratches and unexplained bruising on both arms and across her back. Mother had kept M.L. home the day before the scratches were noticed. When asked to meet to discuss the scratches, mother was exasperated and displeased, stating that the house was a mess and that DCF was harassing her.

3

Father expressed unhappiness about having to "deal with this [expletive]." Parents were observed spanking M.L. very hard on multiple occasions, including once leaving a red mark on her lower back. On another occasion, service providers stopped by the house and knocked for half an hour. The children could be heard inside. Mother finally answered the door; the children looked dirty, the house was messy, and mother would not let the visitors in. The court found that mother was sleeping, leaving the children unsupervised.

¶ 8. The TCO court found little to be drawn from two parenting capacity evaluations that had been done. One doctor indicated that safety was a concern and that parenting three children was a lot for mother to handle without a supportive partner. Father was not allowed to be present during mother's visits with A.L. The State asked the court to consider findings made in April 2016 relative to A.L.'s case. The court found that these findings would be cumulative to the evidence already presented.

¶ 9. Based on its findings, the TCO court concluded that M.L. and H.T. were at risk of harm. It explained that A.L. had demonstrated out-of-control behaviors culminating in injuring M.L. while mother was asleep or otherwise not paying attention. A.L.'s behaviors subsided after some time in foster care but resurfaced when he began having overnight visits with mother. The behaviors subsided again after the overnight visits ceased. The court took into consideration that A.L. had been found to be a CHINS based on similar conditions. See E.J.R. v. Young, 162 Vt. 219, 224, 646 A.2d 1284, 1287 (1994) ("The family court may rely on evidence of the treatment of a sibling in concluding that a child is a CHINS."). M.L. started exhibiting similar behavioral problems once she was returned to parents. She was having very concerning tantrums. Service providers reported the condition of the home to be squalid. There were instances of excessive corporal punishment as well as unexplained injuries to M.L. and inattentiveness to parenting responsibilities. The court found that parents' behavior put the children at risk of harm. See generally 33 V.S.A. § 5308(a)(1) (explaining that in temporary-care proceeding, court must return

legal custody to parents unless it finds by preponderance that doing so would be contrary to child's best interests because, among other things, it "could result in substantial danger to the physical health, mental health, welfare, or safety of the child"). It concluded that the children should be in DCF custody until parents were engaged in services, working with DCF, and attentive, and the causes of M.L.'s behavior could be identified.

¶ 10. At a status conference in October 2016, the parties indicated that they were discussing a possible stipulation to CHINS. The court noted that it had recently held a contested temporary-care hearing and made findings based on direct evidence. Given this, it was not going to relitigate at a CHINS merits hearing what had just occurred in the temporary-care hearing, but parents would have the opportunity to present additional evidence. The court reiterated this in an entry order, stating that it had held a lengthy temporary-care hearing at which the parties litigated the merits of the CHINS petition. It made findings on a clear-and-convincing-evidence standard based on live testimony and concluded that the petition had merit. Given this, it scheduled the case for a two-hour merits hearing at which time parents could present any additional evidence that they believed had bearing on the merits.

¶ 11. DCF drafted an initial case plan in November 2016 with the goal of reunification with parents. The plan contained expectations for both parents, including demonstrating an increased ability to meet M.T.'s needs in a safe manner and working on listening and engaging in conversation with less blaming and aggression.

¶ 12. A CHINS merits hearing was scheduled for January 2017. At the hearing, parents indicated that they had agreed to stipulate that the children were CHINS based on the written decision from the temporary-care hearing; they signed a written stipulation to this effect. The court reviewed the stipulation with parents. It explained to them that they could have presented any additional evidence that they wanted at a merits hearing and that by entering into a stipulation, they were waiving their opportunity to do so. Parents replied that they understood. Parents stated

5

that they entered into the stipulation knowingly and voluntarily. They indicated that they had discussed the stipulation with their attorneys and were satisfied with the attorneys' advice. The court then entered an adjudication of CHINS based on the stipulation. At the time of the court's ruling, a progressive visitation schedule was anticipated to begin, with overnight visits commencing several weeks after the merits hearing. The expectation was that by the time of the disposition hearing, there would be a conditional custody order (CCO) placing both children in parents' care. The court clearly informed parents, however, that if there were significant problems such as unexplained injuries to the children or additional serious hygiene issues in the home, this would affect the likelihood that a CCO would be issued at disposition.

¶ 13. In February 2017, following an unsupervised overnight visit with parents at their home, H.T. was found to have suspicious bruising on his body. DCF determined that the injury was caused by abuse, with the perpetrator unknown. DCF suspended the unsupervised overnight visits, which never resumed. Several months later, mother obtained a temporary relief-from-abuse order against father based on allegations of domestic violence. The order was later vacated at mother's request. In May 2018, mother gave birth to another child.

¶ 14. A disposition hearing began in late February 2017 and was continued at DCF's request given DCF's investigation into the possible abuse of H.T. noted above. Another hearing was set for April 5, 2017. On that day, it was determined that a full-day contested disposition hearing would be required because the parties did not agree on the appropriate disposition. A parenting-capacity evaluation report was also expected to be issued the following month, and it was hoped that the report would provide significant guidance for case planning. The contested disposition hearing was scheduled for July 20, 2017. In early July 2017, DCF filed an amended disposition report with a goal of adoption for both children rather than the concurrent goals contained in the February 2017 disposition case plan. Because the new case plan goal was a significant change, the court cancelled the July 20 hearing. It ordered DCF to file its petition to

6

terminate parents' rights by July 14, and the July 20 hearing was to be a status conference on the petitions only. DCF filed the TPR petitions and at the status conference, it was determined that a three-day contested hearing on the petitions would be required. That hearing occurred in November 2018 and January and February 2019 on five separate hearing days.

¶ 15. The court terminated parents' rights in a July 2019 decision. It made numerous findings and conclusions in a very lengthy decision, most of which we do not repeat here. It granted the petition based on the lengthy passage of time, the children's strong bonds with their foster family, their unusually high needs, and parents' failure to show any significant improvement in parenting capacity, despite their love for the children. We provide additional details with respect to the termination order in connection with parents' arguments below. Parents appealed and they join each another's arguments.[2] In particular, they argue that: (1) the court committed plain error in accepting their CHINS stipulation; (2) the delay between the CHINS merits order and the initial disposition hearing—which was also the termination hearing—deprived parents of due process; and (3) the evidence of parents' parenting style and housekeeping standards was insufficient to justify termination of parental rights.

## I. The CHINS Stipulation

¶ 16. Under 33 V.S.A. § 5315a(b)(2), the court may accept a written stipulation to merits if the parties agree to its terms and the court determines that: the agreement is "voluntary"; the parties "understand the nature of the allegation"; and the parties "understand the rights waived if the court approves of and issues an order based upon the stipulation."

¶ 17. Parents argue on appeal that they did not understand the rights they were waiving because the court did not tell them that the State had the burden of proving its case by a

---

[2] While the juveniles did not file a notice of appeal, they filed notice that they join in the briefs filed by parents. We need not consider if they have standing to do so as we have considered and rejected parents' arguments on the merits.

7

preponderance of the evidence. They further assert that the court should have explained to them the circumstances under which—absent their stipulation—it could have relied on findings from the temporary-care order. See id. § 5315(d) (explaining that, at CHINS merits hearing, court may adopt findings "based on nonhearsay evidence" made in temporary-care order "provided that a witness who testified at the temporary care hearing may be recalled by any party at a contested merits hearing to supplement his or her testimony"). Finally, parents suggest that they were induced to waive their rights in exchange for a favorable conditional custody order which the court did not ultimately issue, rendering their stipulation involuntary. According to parents, the court's errors deprived them of the opportunity to have the merits of the CHINS petition determined by a preponderance of admissible evidence.

¶ 18. As parents acknowledge, plain error is "found only in a rare and extraordinary case where the error is an obvious one and so grave and serious as to strike at the very heart of a [party's] constitutional rights." In re G.S., 153 Vt. 651, 651, 572 A.2d 1350, 1351 (1990) (mem.) (quotation omitted). We find no plain error here.

¶ 19. As reflected above, the CHINS stipulation was under discussion for many months before the merits hearing. The parents were present and represented by counsel throughout the contested, evidentiary temporary-care hearing. They each testified, and the court carefully weighed their testimony. Notwithstanding the court's temporary-care decision, it observed that parents both "testified well." Additional witnesses were also called, and testified, on parents' behalf at the temporary-care hearing. The court made clear to the parties both orally and in writing that it was not going to relitigate matters that were recently decided by clear and convincing evidence following the temporary-care hearing. Parents raised no objection to this approach. They ultimately agreed, after consulting with counsel, to stipulate to CHINS. By entering into the stipulation, the parties waived their right to have a hearing on the merits of the CHINS petition

8

and present any additional evidence under the unobjected-to process described above. The court explained this to parents and parents indicated that they understood.

¶ 20. The court did not commit plain error in this case by failing to explicitly advise parents that, if there was a hearing, the State would have to prove by a preponderance of the evidence that the children were CHINS. Especially in this case, where the State had already presented substantial evidence that the children were at risk, and the court had made findings to the level of clear and convincing evidence, the court did not commit plain error in failing to explain to parents that they could rest on their rights and put the State to its proof. And the failure to specify that the State's burden of proof was a preponderance of the evidence was not a grave error warranting reversal, especially given that the court had already made relevant findings using a clear-and-convincing standard, and the preponderance standard is a relatively low one.

¶ 21. Nor did the court commit plain error by failing to explain to parents when, and under what circumstances, a court can rely on temporary-care findings in a CHINS merits hearing. The court discussed this issue at the status conference preceding the merits stipulation and parents raised no objection to the court's approach. We note that most of the court's findings in the TCO—adopted in support of the CHINS findings—were made by clear and convincing evidence, and the court made sufficient findings on the basis of nonhearsay evidence to support a CHINS order.

¶ 22. Finally, parents' suggestion that they were somehow wrongly induced into stipulating to CHINS with the (unfulfilled) promise of a CCO at merits is unsupported by the record. The court made clear to parents that while a CCO was contemplated, its disposition order would depend on what occurred between the merits ruling and the disposition hearing.

¶ 23. While the parents may have benefitted from a more thorough discussion with the court, we conclude that the record in this case does not show that parents failed to understand the rights they were giving up by stipulating to CHINS, and that, in approving parents' stipulation

9

under § 5315a, the court did not commit any error that was so obvious, grave, and serious as to warrant reversal. See In re G.S., 153 Vt. at 651, 572 A.2d at 1351.[3]

## II. Delayed Disposition

¶ 24. Parents next assert that the delays "created by the State" deprived them of their rights without due process and prejudiced the outcome of the case by mooting their objections to the case plan and their requests to return the children to their care. They argue that the State was not allowed to keep the children in custody pursuant to a temporary-care order for the length of time at issue here, and that the case therefore must be dismissed. Mother further asserts that parents were prejudiced by the court's failure to adopt a case plan in a timely fashion.

¶ 25. We conclude that the court's failure to enter a disposition order for two-and-a-half years after its merits order was error, but that in the specific circumstances of this case, the error was harmless.

¶ 26. As to the error, periodic status conferences are no substitute for the process provided for in our juvenile statutes, pursuant to which a merits determination is ordinarily followed by a disposition order, then regular post-disposition reviews by the court. Normative "convene and continue" events do not serve to advance the meaningful process contemplated by statute.[4] Although, at any given juncture, further delay of the disposition hearing may have made sense under the circumstances, the collective effect of those incremental delays was a gap of two-

---

[3] Undoubtedly, given the significance of the rights at issue and the provisions of 33 V.S.A. § 5315a(b)(2), the court must engage in meaningful colloquy to make sure that parents are aware of procedural rights that they are giving up as a result of a merits stipulation. However, because we conclude that the trial court's acceptance of the parents' CHINS stipulation was not plain error in the circumstances of this case, we decline to articulate a general rule establishing specific elements of a colloquy that the court must engage in or specific disclosures the court must make in considering a CHINS stipulation beyond the general statutory requirements.

[4] Stated simply, chronic, "normative" continuances serve to compound delays in meaningful disposition in CHINS cases. See V.R.F.P. 2(b)(3) ("A hearing on the merits of a petition, or a disposition hearing, shall be continued only for good cause shown and found by the court.").

and-a-half years between the trial court's merits determination and its disposition order. Throughout that period, although the parties did have the benefit of a full panoply of supports and services, they did not have the benefit of a court-reviewed disposition plan. Whether these delays were manufactured by the State—and we reject parents' contention that they were—or caused by the court, or just the result of well-intended decisions by the parties along the way, the potential prejudice to the parents' and children's ability to reunify is the same. The delay in this case was well beyond the pale, and we conclude that it amounted to error.

¶ 27. But we decline to reverse because we conclude the error was harmless. Specifically, we reject parents' jurisdictional argument, and we conclude that parents in this case did not suffer prejudice as a result of the delays. The deficits parents needed to overcome were identified throughout the process and they had comprehensive services and supports throughout the period. We do not find a reasonable probability that the court would have returned conditional custody to parents had it issued a disposition order given that the deficits that led to removal of the children, and ultimately termination, persisted with little change throughout the duration of the case.

¶ 28. Parents' assertion that the court lacked jurisdiction to maintain the children in DCF custody pursuant to the TCO through the course of these proceedings is inconsistent with our case law. "It is settled that juvenile proceedings should be resolved as quickly as is reasonably possible, but the time limits established by the governing statutes . . . are directory and not jurisdictional." In re M.B., 158 Vt. 63, 67, 605 A.2d 515, 517 (1992) (quotation and citations omitted); see also In re D.D., 2013 VT 79, ¶ 24, 194 Vt. 508, 82 A.3d 1143 (noting that disposition "timeline is not mandatory").

¶ 29. Moreover, we agree with the trial court that in this case, parents suffered no prejudice as a result of the delay in completing the disposition hearing and issuing a disposition order. First, the absence of an approved case plan through the course of this case did not create

notice issues for parents. The court's termination order here was not based on any failure by parents to satisfy the expectations DCF laid out in the never-approved case plan; it was based on the court's conclusion, among others, that the parents would not likely be able to resume parenting responsibilities in a reasonable time because of their failure to improve over the course of more than two years despite extensive DCF supports. See, e.g., In re G.L.C., No. 2018-091, 2018 WL 3913133, at *3 (Vt. Aug. 6, 2018) (unpub. mem.), https://www.vermontjudiciary.org/opinions-decisions [https://perma.cc/XW9L-AERG] (noting that trial court's analysis did not turn on mother's failure to comply with any purported requirements imposed by DCF in not-yet-approved case plan but, rather, turned on mother's failure to mitigate underlying problems that led to CHINS determination and child's removal in the first place). Parents were on notice from the outset of—and throughout—this case of the parenting deficits that gave rise to state intervention. DCF's case plan, the temporary-care order, and discussions at court conferences throughout this case made plain the parenting deficits the parents needed to address. The court's termination decision did not introduce new, unanticipated considerations into the mix.

¶ 30. In addition, there is no credible claim here that, had the court issued a disposition order sooner, it would have called for services or supports for the parents that they did not have the opportunity to access. In fact, even in the temporary-care order, the court noted that DCF had been involved with the family for five years and had provided the parties with extensive support, including Family Time coaching, Nurturing Parents group, financial support, daycare, early education, counseling and regular treatment-team meetings. In terms of custody, the court found it difficult to determine what additional services DCF could provide to parents to keep the children in the home.

¶ 31. Nor do we accept parents' argument that had the court held a timely disposition hearing it would have placed the children with parents pursuant to a CCO, thereby changing the course of this case. We are mindful of the trial court's TCO findings, which led to removal of the

children in the first place. Not long after the CHINS merits hearing, following an unsupervised overnight visit with parents at their home, H.T. was found to have suspicious bruising on his body that was determined to be caused by abuse, with the perpetrator unknown. DCF suspended the unsupervised overnight visits, which never resumed. Several months later, mother obtained a temporary relief-from-abuse order against father based on allegations of domestic violence (at a time when the children were not present). The order was later vacated at mother's request. In May 2018, mother gave birth to another child, greatly exacerbating the household chaos and parenting deficits that gave rise to state intervention. It is clear from the trial court's analysis that the deficits that led the court to ultimately terminate parents' rights existed throughout the case—from the time of the TCO through TPR. We cannot conclude on the basis of the court's analysis and the record that, had the court completed a disposition hearing sooner, there is a reasonable probability it would have placed the children in parents' care.

¶ 32. We further reject parents' assertion that they were prejudiced by the delays because the court's ultimate decision was based on the amount of time that had passed. In fact, as explained above, the court found that the delay gave parents additional time to show improvement. Despite being provided with such time, parents nonetheless failed to show "sustained, significant benefit from the education and support that they ha[d] been offered in how to parent the children." While they received parent coaching for a very long time, for example, they still could not make sustained changes. The court described chronic problems that had continued without any significant abatement since 2014, including: chronic mess, clutter, dirt, insects, and unpleasant smells in the residence; parents' yelling or talking very loudly both to one another and the children; their failure to provide a clear, consistent routine for visits; their inability to control M.L.'s, and later H.T.'s, tantrums; their failure to follow consistent rules and expectations for the children; their inability to effectively discipline the children; father's apathetic and uninvolved attitude toward parenting and household chores; and parents' attitude and practice of blaming and deflecting responsibility

13

onto others. The court also found that parents had never accepted full responsibility for having failed to provide proper parental care to the children at the time DCF first became involved with their family. It added that, among other things, parents also failed to effectively address the very disturbing allegations of family violence and controlling behavior by father that mother had made, under oath, in her June 2017 relief-from-abuse complaint. The court's decision did not rest on the passage of time alone, but rather, the passage of time without progress.[5]

### III. Sufficiency of Evidence and Findings

¶ 33. Finally, parents argue that the court's findings do not support its conclusions about their inability to parent the children within a reasonable time. They suggest that the court's findings about them and their unsanitary living conditions reflect "cultural differences" that should not play a role in a termination decision. They maintain that the findings do not show their inability to parent the children within a reasonable time. Father also asserts that the court erred in finding that he could not control the children's tantrums. And, parents argue that the court "ignored" the opinions of the children's guardians ad litem.

¶ 34. To determine the best interests of a child, the court must consider four statutory factors. See 33 V.S.A. § 5114(a). The most important factor is the likelihood that the parent will be able to resume parental duties within a reasonable time. See In re B.M., 165 Vt. 331, 336, 682 A.2d 477, 480 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. at 652, 572 A.2d at 1351. We do not reweigh the evidence or reassess the credibility of witnesses on appeal. See In re S.B., 174 Vt. 427, 429, 800

---

[5] Notwithstanding any overlap in the analysis generally, it is clear that the court here did not modify an initial disposition order based on stagnation. Thus, mother's reliance on In re M.P. is misplaced. See 2019 VT 69, ¶ 30, __ Vt. __, 219 A.3d 1315 ("We reiterate that stagnation was inapplicable in the absence of a disposition order of the court that included a case plan that father had to follow.").

A.2d 476, 479 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [an individual's] parental rights").

¶ 35. The court did not terminate parents' rights because they lived in a "smelly house," as they suggest. Instead, it found that they failed to make any progress in their ability to parent. This failure included an inability to maintain a home free of filth, the "unpleasant smells" being urine and feces; it also included their failure to learn from parenting coaching, and numerous other obstacles recited above. The court's numerous findings are amply supported by the evidence and they support the court's conclusion. This includes the finding that parents could not control the children's tantrums, as reflected in the detailed notes from the Family Time coaches and other testimony at the hearing. Any error in the court's finding about father's ability to control M.T.'s tantrums would be harmless in any event given the court's numerous other findings.

¶ 36. While the delay in the initial disposition hearing meant the court did not have to find stagnation in order to terminate the parents' residual parental rights, the court made findings that support stagnation. The Family Time coaches ceased coaching parents, as testified at the hearing, due to parents' stagnant parenting skills and their inability to make progress despite the coaches' lengthy and consistent efforts to provide them guidance and advice. Finally, the court was not required to expressly consider the opinions of the guardians ad litem in reaching its decision. See V.R.F.P. 6(e)(3) (stating that guardian may, at a disposition hearing, "state his or her position or opinion and the reasons therefor"). Contrary to parents' assertion, the court did not "ignore[] the injustices that were apparent to service providers, expert witnesses and the GALs." Instead, it applied the law and evaluated, based on the evidence, whether terminating parents'

rights would be in the children's best interests.[6]   While parents disagree with the court's conclusion, they fail to show error.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 37.   **ROBINSON, J., dissenting.**   This is a hard case.  I respectfully dissent because I cannot agree that the error in failing to complete the disposition hearing for more than two years after the CHINS merits determination was harmless.

¶ 38.   The procedural course and substantive evidence in this case are important.  As the majority sets forth in detail, the trial court made extensive findings by clear and convincing

---

[6]   The dissent notes that "children, like their parents, have a strong statutorily and constitutionally protected interest in relationships with the parents with whom they have established bonds" and that, in this case, "[t]he children's interests in protecting the parent-child bonds are fully aligned with those of their parents."  Post, ¶ 43 n.10.  We note that the children did not file a notice of appeal in this case.

While a trial court obviously is not obligated to simply accept a party's recommendation with respect to a termination petition, we recognize that a child's viewpoint, and the opinion of a child's guardian ad litem where authorized pursuant to V.R.F.P. 6(e)(3), are important and worthy of consideration.  See generally In re S.B., 174 Vt. at 429, 800 A.2d at 479 (recognizing that trial court may consider preferences expressed by older child in evaluating certain statutory best-interest criteria, but Legislature has not chosen to give such preferences "inordinate weight"); see also V.R.F.P. 6(e)(3) (stating that "guardian ad litem may, at a disposition or temporary care hearing . . . , state his or her position or opinion and the reasons therefore").  Ultimately, it is for the trial court to evaluate the evidence and determine what course of action is in a child's best interests.  In this case, the trial court sought out the opinions of the children's guardians ad litem and there is nothing to suggest that it failed to consider these opinions.  It engaged in a detailed analysis of the evidence in its seventy-page decision and fully addressed the statutory best-interest criteria.  In reaching its decision, the court was not required to specifically recite and weigh each party's preferred outcome.  We defer to the trial court's evaluation of the evidence on appeal and review its decision only for abuse of discretion.  See id. ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights with respect to [a child], notwithstanding [that child's] stated opposition to termination.").  We find no abuse of discretion here.

16

evidence in its initial temporary-care order (TCO), following a contested temporary-care hearing. Some of those findings were based on reliable hearsay, which is admissible in a temporary-care hearing; some were based on hearsay. The court concluded that M.L. and H.T. were at risk of harm based primarily, though not exclusively, on nonhearsay evidence. First, the court relied on the fact that the children's older half-brother exhibited out-of-control behaviors before he was removed from the parents' home, and those behaviors subsided after some time in foster care but resurfaced when he had overnights with his mother. Insofar as M.L. had begun exhibiting similar out-of-control behaviors to her older brother, the court inferred that she, too, was at risk. Second, the court found that service providers reported the condition of the home to range from "very messy to squalor." Third, the court noted "instances of excessive corporal punishment." And finally, the court noted unexplained injuries on M.L. and inattentiveness to parenting responsibilities.

¶ 39.   The parties ultimately stipulated to CHINS, based on the temporary-care order.[7] At that juncture, all parties and the court expected that visitation would progress to unsupervised

---

[7]   Although I focus my dissent on the impact of the delay on the ultimate decision to terminate parents' rights, I agree with parents that the process leading up to their CHINS stipulation compromised the voluntariness of their respective stipulations. In an October 2016 status conference preceding a CHINS merits hearing, the court noted that most of its findings in the temporary-care order were based on live witnesses rather than hearsay, and said, "frankly I could make a merits finding based on what I already heard." The court noted that parents might want to provide additional evidence as to merits, but explained that "we're not going to relitigate everything that took place in the temporary care hearing." The court reiterated its impressions of the evidence at the beginning of the merits hearing, before parents had executed a stipulation.

Although much of the evidence supporting the trial court's findings in the temporary-care hearing were not based on hearsay evidence, some of the significant findings were. See 33 V.S.A. § 5307(f) (reliable hearsay testimony may be admissible in a temporary-care hearing). Among the court's temporary-care order findings that were based solely or partly on hearsay evidence were its findings concerning "instances of excessive corporal punishment," the messy or squalid condition of the parents' home, parental inattentiveness, and unexplained injuries. To the extent that the record suggests that parents signed the merits stipulation believing that these findings were established for purposes of merits, subject only to their opportunity to provide additional clarifying evidence, I cannot join the majority's conclusion that their stipulations were voluntary. By specifically requiring that a parent's stipulation to CHINS be voluntary, the Legislature has

17

visitation within two weeks, and to overnights in three weeks or so, with an expectation that the disposition order would call for a conditional custody order (CCO) with various restrictions and limitations. The court noted its understanding that "if there's any real bad mess up that that will not be what happens in the disposition." It elaborated:

> [I]f M.L. shows up at school with some unexplained injury that happened under suspicious circumstances, you're not going to see a CCO disposition. Or if DCF should stop by the house and . . . the dog has defecated all over the house and there's garbage strewn throughout the rooms and things look the way they did at the time the kids came into custody, I don't know that DCF will find itself bound to recommending a CCO disposition.

¶ 40. At that point, the case went off the rails. Overnight visits were suspended following the appearance of suspicious bruising on H.T.'s body after an unsupervised overnight visit with parents. The disposition hearing nominally began in February 2017, but was continued to give DCF time to investigate the bruising. Then the court put off hearings in April and July 2017. DCF filed a petition to terminate parental rights in July 2017, and the court finally held an evidentiary disposition/TPR hearing beginning in November 2018 and concluding in February 2019. That hearing—beginning seventeen months after the unexplained bruising and ending a full two years after that event—was parents' first opportunity for an evidentiary hearing on the circumstances that led DCF (and the court) to abandon the plan to place the children with parents at initial

---

signaled that we cannot simply presume that the stipulation of a parent who is (adequately) represented by counsel must be voluntary. See 33 V.S.A. § 5315a(b). Instead, the Legislature has expressly required that courts evaluating CHINS stipulations determine that the agreement between the parties is voluntary, that the parties to the agreement understand the nature of the allegation, and that the parties to the agreement understand the rights waived. Id. Although I do not suggest any particular colloquy or formula for assuring voluntariness, where the record reflects that the parents were potentially significantly misled as to the quantity and quality of the evidence that the court had already agreed to consider for CHINS merits purposes, I believe such a misimpression, if left uncorrected, does compromise the voluntariness of the parents' stipulation. Cf. In re Moulton, 158 Vt. 580, 584, 613 A.2d 705, 708 (1992) (stating misinformation regarding parole eligibility may support a successful attack on the voluntariness of a plea).

disposition pursuant to a conditional custody order.[8]  Throughout that two-year period, children lived in a foster home, formed bonds with their foster care providers, who are prepared to adopt the children, and became adjusted to their lives in foster care.

¶ 41.    Given this history, I cannot join the majority's conclusion that the error in delaying the initial disposition hearing in this case for over two years was harmless.  I part ways with the majority on this question for three reasons—one legal, two factual.  First, given the constitutional ramifications and the standard for assessing harmless error in this context, we should be particularly wary of basing a harmless-error analysis on speculation.  Second, I disagree with the majority's assertion that it is clear that the deficits that led the court to ultimately terminate parents' rights existed throughout the case—"from the time of the TCO through TPR"—so there is no reasonable probability that the court would have placed the children in the care of their parents had the court held a timely disposition hearing.  See ante, ¶ 31.  And third, I believe the years these children spent forming important bonds with their foster (and prospective adoptive) parents played a significant role in the termination of the parties' parental rights.

¶ 42.    With respect to the applicable legal framework, an error in a termination of parental rights case warrants reversal only if "a substantial right of the party is affected."  In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108, 39 A.3d 682 (quotation omitted).  That standard must be understood in the context of the constitutional ramifications of a termination decision, and the State's burden of proof in such cases.  The Legislature and this Court have consistently recognized the primacy of the parent-child relationship, and the limitations on state authority to intervene in that relationship.  See 33 V.S.A. § 5101(a)(3) (providing statute should be construed "to preserve the family and to

_____

[8]  I do not suggest that the State, or the court, intentionally orchestrated such a lengthy delay for an ulterior purpose.  At any given juncture, the decision to defer an evidentiary disposition hearing until a later date no doubt seemed prudent to the State and the court, and in some cases perhaps even parents' counsel.  But the cumulative effect of these delays was significant and cannot be ignored.

separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety"); In re N.H., 135 Vt. 230, 236, 373 A.2d 851, 856 (1977) (recognizing that "the freedom of children and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law" (citing Stanley v. Illinois, 405 U.S. 645 (1972); Prince v. Massachusetts, 321 U.S. 158 (1944); Meyer v. Nebraska, 262 U.S. 390 (1923))). For that reason, before the State may "sever completely and irrevocably" the rights of a parent in their child, "due process requires that the State support its allegations by at least clear and convincing evidence." In re D.C., 2012 VT 108, ¶ 21, 193 Vt. 101, 71 A.3d 1191 (quoting Santosky v. Kramer, 455 U.S. 745, 747-48 (1982)).

¶ 43. The harmless-error analysis is necessary retrospective; we are called upon to determine how a case would have unfolded in the absence of an established error. Because in juvenile cases, in contrast to most other case types, the facts and evidence are dynamic and ever-evolving, rather than fixed in a static record, the project of determining how things would likely have unfolded in the absence of an error—particularly an error relatively early in the process—is especially perilous, and vulnerable to undue speculation. The constitutional rights at stake for both parent and child[9] require that this Court have a high degree of confidence that an error had no impact before it affirms an order terminating parental rights following a significant substantive or

---

[9] The parental rights of parents and the rights of their children are sometimes described, inaccurately, as necessarily competing. But children, like their parents, have a strong statutorily and constitutionally protected interest in relationships with the parents with whom they have established bonds. See In re N.L., 2019 VT 10, ¶ 39, __ Vt. __, 201 A.3d 475 (Robinson, J., dissenting) (noting "substantial and permanent consequences of a termination of parental rights, with profound implications for the constitutional rights and most intimate personal experiences of both parent and child"); see also Santosky, 455 U.S. at 760 ("At the factfinding, the State cannot presume that a child and his parents are adversaries. . . . [U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their . . . relationship."); In re D.C., 2012 VT 108, ¶ 27 (agreeing with general principle described in Santosky). This case is Exhibit A: the guardians ad litem for both children opposed termination of parents' rights. Through counsel, children support parents' position on appeal. The children's interests in protecting the parent-child bonds are fully aligned with those of their parents.

20

procedural error. On this record, although I agree with the majority that there is no basis for concluding that the parents would have had access to more or different services had they had the benefit of a timely disposition hearing, I do not have a high degree of confidence that, had the trial court held a timely disposition hearing, it would not have placed the children with parents pending further proceedings.

¶ 44. My lack of confidence is based in part on my rejection of the assertion that the circumstances that ultimately led to termination of parental rights in this case persisted, unabated, from the time of the temporary-care order until the termination order. Even _after_ the temporary-care order, and _after_ the CHINS stipulation, the court and parties all anticipated the imminent return of both children to parents pursuant to a conditional custody order. Given that fact, it is not the case that, based on the TCO findings and conclusions, we can confidently conclude that the court would have declined a conditional custody order. The court expressly indicated otherwise at the merits hearing.[10] What changed was the appearance of suspicious bruising on H.T.'s body following unsupervised overnight visitation. That suspicious bruising may have provided a reasonable basis for temporary cessation of unsupervised overnight visits, and perhaps even postponement of the disposition hearing (although the court could have begun taking evidence at the originally scheduled disposition hearing while leaving the temporary-care order in place). But neither DCF nor the trial court ultimately found that the bruising was attributable to abuse or neglect on the part of either parent. Accordingly, the critical consideration that perpetuated these children's removal from their parents for over two years pending resolution of the TPR/disposition hearing was a suspicion that was not subjected to the rigors of a court hearing throughout that

---

[10] This CHINS merits hearing also occurred long after the events documented in H.T. and M.L.'s older half-brother's CHINS proceeding, and recounted at great length in the TPR court's findings.

21

period, and was never proven by a preponderance of the evidence, let alone clear and convincing evidence.[11]

¶ 45. The years the children spent living with foster parents—their prospective adoptive parents—were significant in driving the trial court's TPR order. The TPR court found that the children were strongly bonded to both of their foster parents, and to each other. The court found that the children had been living with their foster family for more than twenty-eight months, had fully adapted to that home, and were well adjusted and adapted to the routines there. The children referred to their foster parents as "mom" and "dad," and were happy, healthy, and well adjusted to their schools.

¶ 46. The court found that parents had taken "very significant steps to meet many of the proposed disposition case plan goals." They had stable housing and employment, were self-supporting, had taken multiple parenting classes, and had attended visits with the children as scheduled and on time. The court found that the children are affectionate towards the parents, glad to have regular contact with them, and happy to hug and snuggle with both parents. But the court identified numerous offsetting parenting shortcomings: the chronic mess, clutter, and smells in their home persisted; they did not provide a clear, consistent routine for visits; they were unable to control the children's tantrums; they failed to follow consistent rules and expectations for the children; they weren't able to effectively discipline the children; father still had an uninvolved attitude toward parenting and household chores; and both parents tended to deflect responsibility for their shortcomings to others. Although the children were happy to spend time with them, the children did not view them as parents. The court concluded that neither parent could provide the

---

[11] The TPR court found that the nature and source of the injury were investigated by DCF, which determined that "the injury was caused by abuse, but by an 'unknown person.'" The court noted that by letter of March 17, 2017, DCF investigators notified the parents that they had determined that H.T. "did sustain suspicious bruising for which [they] were unable to definitely determine where or when they were caused or by whom."

children with the stable, calm, consistent parenting and the safe, clean environment that they needed.

¶ 47.    Whether these considerations alone, apart from the children's need for permanency and adjustment to their longtime foster home, would support termination of parents' rights is questionable.  Notably, parents continue to parent a younger child without DCF interference—a fact that suggests these parents are capable of safely parenting.[12]

¶ 48.    I'm sympathetic to the position that at this late date it could be harmful to remove the children from their foster family and place them with parents; although the trial court found that the children felt affection for their parents, and were glad to spend time with them, it also found that at this point they view their foster parents as their "mom" and "dad."  But I cannot ignore the fact that this reality is itself a product of an unconscionable delay in the court process, which left these children to bond with and adjust to life with their foster family while denying parents an opportunity to reassume custody while they worked through the case plan.  For this reason, I respectfully dissent.

_____
Associate Justice

---

[12]  I do not suggest that DCF should seek custody with respect to this younger child; I only flag this fact to highlight the likelihood that H.T. and M.L.'s relationships with their longtime foster parents were a significant factor in the court's termination of parents' rights.