VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     26-AP-010



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MAY TERM,   2026

| | |
|---|---|
| In re N.B., Juvenile <br> (B.B., Father\* & T.R., Mother\*) | APPEALED FROM: <br><br> Superior Court, Franklin Unit, <br> Family Division <br> CASE NO. 22-JV-01196 <br> Trial Judges: Robert W. Katims (merits); <br> Howard A. Kalfus (disposition) |

In the above-entitled cause, the Clerk will enter:

Parents appeal from family division orders adjudicating their daughter, N.B., a child in need of care or supervision (CHINS) and granting the State's petitions to terminate their parental rights in N.B. at initial disposition.  Mother argues that: (1) the court erred in concluding that N.B. was CHINS; and (2) her constitutional due-process rights were violated by delays in holding the CHINS merits and initial disposition hearings.  Father contends that the court erred in terminating his parental rights at disposition because he demonstrated the prospective ability to parent N.B.  We affirm.

### I. Background

In light of mother's second argument, we recite the procedural background of this case in detail.  N.B. was born on August 7, 2022.  Five days later, the State filed a petition seeking an adjudication that she was CHINS.  The supporting affidavit included the following allegations.

N.B. is mother's seventh child and father's eighth child.  Parents share three children: N.B. and her older twin sisters, who were placed in the custody of the Department for Children and Families (DCF) shortly after their births in June 2020.

In June 2022, the twins reunified with parents while remaining in DCF custody.  At the time, the expectation was that parents would continue engaging with the action steps set forth for them in the twins' case plan, including father refraining from domestic violence.  In July 2022,

however, DCF received a report that father had strangled mother—who was then eight months pregnant with N.B.—in front of the twins. Although parents denied this, a DCF worker observed what appeared to be a fingerprint mark on mother's neck and learned that mother reported to a friend that father had "put his hands on [her]." The twins were removed from parents' home and returned to foster care. DCF then received additional reports suggesting there might be ongoing substance abuse in the home, and that mother was overwhelmed by having the twins in her care and had failed to bring them to several important medical appointments.

The DCF worker also learned that, as a result of pregnancy complications, mother's medical team had advised her that she needed to be induced between August 2 and 4 for the safety of herself and N.B. Mother, however, did not go to the hospital to deliver N.B. until August 6.

The family division placed N.B. in DCF custody under emergency- and temporary-care orders. In September 2022, the court held a combined status conference in the juvenile cases involving N.B., the twins, and mother's teenage daughter. It noted that the four proceedings were "at very different places procedurally," though it was not clear that the cases could be addressed individually because "[t]here either has to be a plan to try to work with this family as a whole or not." Following a recess, the parties presented a plan to move forward in all four cases. Father's attorney then raised the issue of a merits hearing in N.B.'s case. He indicated that he had inquired about whether the State and DCF "were willing to, kind of, kick that can down the road," and stated that he did not think having a merits hearing in N.B.'s case "should be a focus of ours." The State responded that if parents were willing to agree to the action steps that would have been in N.B.'s disposition case plan within the twins' plan, there was no need for an immediate merits hearing. Mother's attorney did not object or otherwise indicate disagreement with this proposal.

At the next hearing in October 2022, the court addressed all four cases but noted that N.B.'s case was "pre-merits" and asked the parties to state their position on that issue. Father's attorney indicated that he and mother's attorney were in favor of continuing to delay merits while parents worked on their action steps in the twins' case plan. The State agreed that if parents continued to make good progress in this work, it was willing to "effectively withdraw" the CHINS petition as to N.B. The parties also agreed that the case involving mother's teenage daughter would be heard separately moving forward as it involved different parties and issues.

The court held combined status conferences in N.B.'s case and the twins' cases in November and December 2022 and January and early March 2023. At the March status conference, the parties discussed the possibility of the court issuing an order placing N.B. in parents' conditional custody. The court indicated that it would reset the matter for later that month to see whether the parties had reached an agreement regarding a conditional custody order (CCO) or, in the alternative, whether the matter would need to be set for a contested hearing. At the hearing later that month, DCF indicated that it no longer supported issuance of a CCO in light of recent events. Mother's attorney stated that, "[i]n the interest of reunification, I think we should be moving as quickly as possible to issue the CCO." Father's attorney agreed. The court indicated that when a motion for a CCO was filed, the court would schedule a contesting hearing. Parents filed a motion for a CCO the following day.

The CCO hearing was scheduled for April 2023. At the outset of the hearing, N.B.'s attorney indicated that she had just determined she had a conflict and would need to withdraw. The court granted the motion to withdraw and indicated that the hearing would need to be continued given the requirement that N.B. be represented by counsel. Before the hearing concluded, counsel for the State raised that the matter had not yet been scheduled for a merits hearing and moved that the hearing be scheduled. Because no attorney for N.B. was present, the court requested that the State file a motion. Accordingly, the State filed a motion requesting that N.B.'s case be scheduled for a merits hearing. The court appointed a new attorney for N.B., and a full-day merits hearing was scheduled for October 2023.

The CCO hearing was held over two days in August 2023. The court subsequently issued a written order denying parents' request for a CCO and concluding that continued DCF custody was necessary to protect N.B.'s health, safety, and welfare.

The merits hearing began in October 2023. The evidence had not yet been closed by the end of the day, and the court ordered that a continuation be scheduled. At the end of the hearing, the court took up and denied parents' motion for unsupervised visits with N.B. In doing so, it cited parents' unwillingness to cooperate with DCF in response to legitimate issues, failure to appreciate or acknowledge deficiencies in their care of the children, and inappropriate interactions with DCF workers, explaining that this was "all of great concern to the court" and did not put it "in a position to expand visits."

A permanency-planning and reasonable-efforts hearing was held in N.B.'s case in November 2023. The court and parties discussed the ongoing merits hearing and, given that circumstance, extended the reunification goal date to January 2024.

The CHINS merits hearing was concluded on December 19, 2023. Both the State and mother sought an opportunity to submit post-hearing filings. Mother's attorney requested a filing deadline of January 19, 2024. The court granted this request, explaining that any party could submit a post-hearing filing by that date and that it would not consider the matter before that time. After the filing deadline passed, the court issued an order noting that no parties had filed proposed findings and affording an additional opportunity to do so. Nothing was filed before the extended deadline, and the court issued a written decision on the merits in May 2024.

The merits order included the following factual findings. On the date the petition was filed, parents were in an ongoing relationship that involved domestic violence. Importantly, parents largely denied that domestic violence was occurring and failed to address it through counseling. In addition, in the months leading up to N.B.'s birth, the placement of the twins in parents' home overwhelmed them to the point of being unable to keep critical medical appointments and coaching time meetings. Parents nonetheless refused to accept assistance from DCF or others. As a result, the twins were removed from their home. Based on these findings, the court concluded that N.B. was CHINS at the time the State filed its petition and indicated that a disposition hearing would be scheduled.

The disposition hearing was set for June 2024. The State moved to continue the hearing on grounds that DCF had requested an additional two to three weeks to prepare the disposition case plan. It noted that mother had a pending motion for unsupervised visits and proposed that

the hearing time be used for that matter. The court granted the motion to continue. After taking evidence on mother's motion to resume unsupervised parent-child contact in parents' home, the court denied that motion. It found that mother had failed to address the concerns that led to N.B. being placed in DCF custody, including reports of domestic violence in the home, and noted that mother had recently been inconsistent in attending visits with N.B.

In July 2024, DCF filed a disposition case plan with a goal of adoption. In August 2024, the State filed a petition to terminate parents' rights in N.B. The parties agreed to an October 2024 parenting assessment in advance of the termination hearing.

As the parties prepared for the termination hearing in N.B.'s case, the court issued a separate order terminating parents' rights in the twins. In re F.R., No. 24-AP-307, 2025 WL 1010188, at *1 (Vt. Apr. 4, 2025) (unpub. mem.), https://www.vtcourts.gov/sites/default/files/documents/eo24-307.pdf (affirming order terminating parents' rights in twins on appeal). Shortly thereafter, mother's attorney—who had also represented her in the twins' cases—moved to withdraw at mother's request. The court granted the motion, but warned that the appointment of a new attorney would not be permitted to delay disposition given the length of time the case had been pending.

The court held a pre-trial hearing in April 2025. Mother's newly appointed attorney indicated that the final parenting-assessment report had been completed the month prior but had not yet been shared with any party other than father. The court granted requests from the State and N.B. for time to review the report before filing their witness and exhibit lists. Shortly before the first day of the hearing, however, mother's new attorney moved to withdraw, indicating that he had discovered a conflict of interest. The court granted the motion, cancelled the upcoming hearing, and ordered that a new attorney be appointed for mother.

The termination hearing was held over three days in December 2025. Later that month, the court issued a written order including the following factual findings.

DCF began working with father approximately twenty years ago and began working with mother approximately fifteen years ago. Over the years, DCF made numerous referrals for parents to receive services, including parenting education, domestic-violence services, substance-abuse support, home healthcare, early childhood intervention, housing support, and mental-health counseling; DCF also provided parents with financial support, including food and gas vouchers. At the time of the termination hearing, none of parents' children were in their custody, and none had been for some time.

In mid-February 2023, N.B. and the twins were placed with parents for a trial reunification. The trial was unsuccessful. By the end of March, there were concerns that parents were not addressing the twins' medical needs. Moreover, N.B.—who was then just under eight months old—had lost weight, and DCF believed this was a result of parents failing to meet her nutritional needs. N.B. was weighed on the day she was removed from parents' home; when weighed on the same scale three days later, she had gained a significant amount of weight.

In the two-and-a-half years between the end of the trial reunification and the termination hearings, parents failed to progress beyond having three supervised visits with N.B. per week.

While parents were loving and affectionate with N.B. during visits, they did not always take advantage of opportunities to see her and did not attend scheduled visits consistently. Although their visit time with N.B. was limited, parents would sometimes leave visits to smoke. Parents required prompting and reminders from DCF to attend visits and schedule and attend N.B.'s medical appointments.

N.B. did not talk about parents between visits. Though the court did not conclude that this was attributable to parents' conduct, it found that she became more emotional around visit days, exhibiting frustration, not listening well, and having night terrors with greater frequency.

In 2023, mother's teenage daughter was placed at home with parents while remaining in DCF custody. This trial reunification was also unsuccessful. At one point, father found mother's daughter in a parked car with her boyfriend and smashed the window with a crowbar, causing shattered glass to fall on her. He then brought her home and smashed her cell phone. Father alleged that the incident occurred because law enforcement sent him to find mother's daughter, who had been kidnapped and sexually assaulted. The court did not credit this explanation, finding this incident instead an example of father's anger issues and violent tendencies.

On this point, the court also found that father had threatened to kill DCF workers and referred to another individual who expressed a desire to kill DCF workers as his "idol." Father admitted making these statements, but did not seem to appreciate why they gave rise to concern in the context of his other violent behavior. He continued to minimize his conduct and did not accept responsibility for it. Although father had recently improved his behavior during interactions with DCF workers, the court found that in the context of his history, these changes were inadequate to ensure N.B.'s safety if she were to return to his care.

Domestic violence continued to be an issue for the parents. At the end of 2023, mother told DCF that she was looking for support so she could leave father—however, she ultimately did not leave. Parents continued to deny that domestic violence was a problem in their home.

Both parents had histories of substance abuse, although mother's history was more recent than father's. While mother initially testified that she abstained from using illicit substances over the last five years, she later admitted to taking benzodiazepine in the last year.

At the time of the termination hearing, N.B. was three-and-a-half years old and had been in three foster homes. She had an immediate need for permanency.

Despite "overwhelming" evidence of struggles with anger management, substance use, and failure to meet their children's basic needs, parents continued to blame others for their lack of progress toward reunification. Although they had many years to address these issues and received support from DCF in doing so, parents did not make the progress necessary to reunify with N.B. The court explained that parents' "lack of insight, given the passage of so much time and the removal of all twelve of their older children as well as [N.B.]" left it with "no confidence that either parent would be able to safely parent [N.B.] at any time in the near or even distant future."

The court then weighed the statutory factors and concluded that it was in N.B.'s best interests that both parents' rights be terminated. This appeal followed.

## II. Analysis

Mother asks that we reverse the CHINS merits order on appeal or, in the alternative, reverse the order terminating her parental rights in N.B. at initial disposition. See 33 V.S.A. § 5315(g) (providing that merits adjudication "is not a final order subject to appeal separate from the resulting disposition order"). Father argues for reversal of the termination order on independent grounds. We address the challenges to each order in turn.

## A. CHINS Merits Order

The State alleged that N.B. was CHINS in that she was "without proper parental care or subsistence, education, medical, or other care necessary for . . . her well-being." Id. § 5102(3)(B). At merits, the State bore the burden to prove, by a preponderance of the evidence, that N.B. was CHINS at the time the petition was filed. In re L.M., 2014 VT 17, ¶¶ 19-20, 195 Vt. 637. "Because the critical focus in a CHINS proceeding is on the child's well-being, the State is not required to demonstrate that the child has suffered actual harm, but rather is subject to a risk of harm." In re J.C., 2016 VT 9, ¶ 7, 201 Vt. 192.

On appeal from a merits adjudication, "[i]t is not our role to second-guess the family court or to reweigh the evidence." In re M.M., 2015 VT 122, ¶ 12, 200 Vt. 540 (quotation omitted). Thus, we will uphold the court's factual findings unless clearly erroneous and will affirm its legal conclusions if supported by those findings. In re J.N., 2023 VT 34, ¶ 8, 218 Vt. 137.

Mother argues that the evidence presented at the merits hearing did not support the court's conclusion that N.B. was CHINS in August 2022. She observes that, during the merits hearing, a DCF worker testified that the agency was "potentially not going to ask for custody" of N.B. after her birth provided that mother followed all of the hospital's medical recommendations. Mother points to Vermont's Freedom of Choice Act, which provides, in relevant part:

> A public entity as defined in section 9496 of this title shall not, in the regulation or provision of benefits, facilities, services, or information, deny or interfere with an individual's fundamental rights to choose or refuse contraception or sterilization or to choose to carry a pregnancy to term, to give birth to a child, or to obtain an abortion.

18 V.S.A. § 9494(a); id. § 9496(2)(A) (defining "public entity" to include "any agency, department, office, or other subdivision of State government"). She argues that DCF's conduct in filing the petition represented "interference" with her decision "to carry her pregnancy to term."

In its merits order, the family court made no findings—and drew no conclusions—related to mother's decision about when to give birth to N.B. Mother contends, however, that the DCF worker's testimony establishes that the State would not have filed a CHINS petition as to N.B. but for mother's decision not to be induced during the timeframe recommended by her medical providers. As a result, she argues, the family division necessarily could not have found that N.B. was CHINS without considering her decision about when to give birth—which, she asserts, is impermissible under the Freedom of Choice Act.

We first note that mother has not made the requisite showing that she preserved this argument for our review by raising it below. In re A.S., 2016 VT 76, ¶ 5, 202 Vt. 415 (explaining that to preserve argument for appeal, party must raise issue in trial court to allow that court fair opportunity it rule on it); In re Green Mountain Power Corp., 2012 VT 89, ¶ 22, 192 Vt. 429 (recognizing that it is appellant's "burden to show how an issue is preserved" for appellate review); V.R.A.P. 28(a)(4)(A) (requiring that appellant's brief indicate how issues were preserved, with citations to record below). In any event, assuming the issue is appropriately before us, we conclude that it is without merit.

The DCF worker's testimony about the agency's motivations for filing the petition, regardless of how it is construed, is not dispositive of the issue before the court at merits. Again, the ultimate question for the court was whether the State met its burden to show, by a preponderance of the evidence, that N.B. was CHINS in August 2022. In re L.M., 2014 VT 17, ¶¶ 19-20; see also 33 V.S.A. § 5315(a) ("At a hearing on the merits of a petition, the State shall have the burden of establishing by a preponderance of the evidence that the child is in need of care and supervision."). The court's conclusion that the State had satisfied its burden did not rest on mother's decisions about when to give birth. Instead, the court concluded that N.B. was CHINS in August 2022 because, in the months prior to her birth: father abused mother; parents became overwhelmed by the placement of the twins in their home to the point of being unable to keep critical medical appointments; and parents failed to follow many of the action steps in the twins' case plan. Mother does not challenge these factual findings, and they support the court's conclusion on the merits entirely independent of the evidence related to N.B.'s birth. See In re J.C., 2016 VT 9, ¶ 7 (recognizing that it is "well settled that the family court may rely on evidence of the treatment of a sibling in concluding that a child is CHINS"); In re L.M., 2014 VT 17, ¶ 20 (holding that "circumstances leading up to the filing of the CHINS petition are relevant to the court's assessment" of whether child was CHINS when petition was filed in that they "allow[] the court to have a full picture of the child's well-being and to base its decision on all relevant information").

Mother has not demonstrated that the court erred in adjudicating N.B. CHINS. Accordingly, we next consider both parents' challenges to the termination order.

## B. Termination Order

The family division may terminate parental rights at initial disposition if it finds by clear and convincing evidence that termination is in the child's best interests after weighing the four factors set forth at 33 V.S.A. § 5114. In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29; see also 33 V.S.A. § 5318(a)(5) (providing that court may terminate parental rights at initial disposition).

The most important of the best-interest factors is the third: "the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The reasonableness of the time period is measured from the perspective of the child's needs and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30 (citations omitted).

We have recognized "that termination at initial disposition should be rare." In re B.M., 165 Vt. 194, 199 (1996). It may nonetheless be appropriate, however, where there is no "reasonable possibility" that the circumstances that led to the filing of the CHINS petition "can be remedied and the family restored within a reasonable time." Id. Even in this posture, "[t]he decision to terminate parental rights" remains "committed to the discretion of the family court." In re D.M., 162 Vt. 33, 38 (1994); In re B.M., 165 Vt. at 199-201. We will affirm the court's findings unless they are clearly erroneous and will uphold its legal conclusions if supported by the findings. In re J.B., 167 Vt. at 639.

Under this standard, we first address mother's challenge to the termination order. As mother points out, both the merits and disposition hearings were held well outside the statutory timeframes. See 33 V.S.A. § 5313(b) (providing that where child who is subject of CHINS petition has been removed from parent's custody under temporary-care order, "a merits hearing shall be held and merits adjudicated no later than 60 days from the date the temporary care order is issued, except for good cause shown"); id. § 5317(a) ("A disposition hearing shall be held no later than 35 days after a finding that a child is in need of care and supervision."). Mother contends that this delay violated her right to due process and prejudiced her by essentially creating the circumstances that led to the termination of her parental rights.

At the outset, we note that while "[i]t is settled that juvenile proceedings should be resolved as quickly as is reasonably possible," this Court has repeatedly held that "the time limits established by the governing statutes . . . are directory and not jurisdictional." In re M.B., 158 Vt. 63, 67 (1992) (citations omitted) (quotation omitted); In re M.C.P., 153 Vt. 275, 294 (1989) (recognizing that "parents' rights to speedy adjudication must be weighed with the children's best interests"). As a result, failure to meet the statutory time limits "does not result in voiding either the disposition order or the CHINS adjudication." In re J.R., 153 Vt. 85, 93 (1989); see also Vt. Human Rights Comm'n v. Agency of Transp., 2012 VT 88, ¶ 8, 192 Vt. 552 (explaining that where statutory time limit is directory, compliance is "discretionary" and "never considered essential to the validity of the proceeding" (quotation omitted)).

We have acknowledged, though, that such delays may in some instances be so extensive as to amount to the type of error mother alleges here. This was the case in In re H.T., where we concluded that a two-and-a-half-year delay between the family court's merits adjudication and order terminating the parents' rights at initial disposition was "well beyond the pale." 2020 VT 3, ¶ 26, 211 Vt. 476. Under the harmless-error standard we apply to termination cases, however, "an error warrants reversal only if a substantial right of the party is affected." In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (quotation omitted). In In re H.T., we declined to reverse because we concluded that the error was harmless. 2020 VT 3, ¶ 27. Although the parents argued that a timely disposition order would have resulted in the return of conditional custody to parents, we concluded that this was not a reasonable probability. Id. Specifically, we explained that the

parenting deficits that led to the removal of the children—and, ultimately, termination of the parents' rights—had been identified throughout the process, but despite the parents' access to comprehensive services and supports, the deficits "persisted with little change throughout the duration of the case." Id.

Here, too, any error arising from the delay of the merits and disposition proceedings was harmless and thus could not result in reversal. Mother argues that, absent these delays, her relationship with N.B. would not have eroded and N.B. would not have had such an immediate need for permanency. On review of the record and the rationales underlying the court's termination order, we see no prejudice.

To begin, the delays in scheduling the merits hearing are, in substantial part, attributable to tactical decisions mother made through counsel about how to proceed. Cf. In re D.C., 2012 VT 108, ¶ 13, 193 Vt. 101 (concluding that where record reflected mother "made a tactical decision through counsel" to proceed as though termination petition had been filed at initial disposition and "explicitly agreed" to trial court's procedural framework, she lost right to challenge that procedure on appeal). Parents elected not to immediately move forward with a merits hearing in N.B.'s case based on the State's agreement to withdraw the CHINS petition if parents demonstrated progress in the twins' case. Unfortunately, that progress did not come to pass—and it was the State, not mother, that ultimately moved to schedule the merits hearing. The other delays—including those occasioned by the withdrawal of N.B.'s attorney, mother's attorneys, scheduling issues, and DCF's need for more time to prepare a case plan—were consistent with circumstances we have recognized as common in juvenile proceedings. See, e.g., In re A.S., 2016 VT 76, ¶¶ 11-17 (describing sources of delays in juvenile proceedings, including "dramatic increase in the juvenile docket," frequent complexity of juvenile cases, which "involv[e] many parties and "present[] difficult issues," "shortage of lawyers to represent parents and children," and "high demand" for courtroom and judge time which "may not be readily available").

In any event, the court repeatedly addressed and rejected mother's motions for a CCO or unsupervised contact throughout this period, concluding that N.B.'s safety could not be assured. It also found that mother failed to consistently attend her supervised visits with N.B. In light of these considerations, it is not clear how an earlier merits adjudication or disposition hearing would have led to an increase in contact between mother and N.B. Moreover, mother's argument regarding N.B.'s immediate need for permanency ignores a vital portion of the court's reasoning underlying the third best-interest factor: the court explained that it had "no confidence that either parent would be able to safely parent [N.B.] at any time in the near or even distant future." Even assuming that N.B.'s need for permanency would have been less pressing had the case progressed more quickly, mother was not prejudiced because the court found that—even with the benefit of more time—mother was not likely to be able to meet that need. Any error was therefore harmless.

In reaching this conclusion, we again emphasize that the statutory "time expectations are extremely important in juvenile cases." In re A.S., 2016 VT 76, ¶ 10. In the absence of prejudice, however, any error in failing to satisfy those timelines is not grounds to reverse a termination order. In re H.T., 2020 VT 3, ¶ 27.

Finally, we turn to father's argument. He points to evidence admitted at the termination hearing, argues that the evidence demonstrated his prospective ability to parent N.B., and contends that the court therefore erred in terminating his parental rights.

The court acknowledged father's recent progress, however, and considered it inadequate to ensure N.B.'s safety if she were to return to his care. It reasoned that N.B. had an immediate need for permanency, and given all of the evidence, it lacked confidence that father could meet that need even if he had the benefit of more time. Father thus essentially asks this Court to reweigh the evidence on appeal. But "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [father's] parental rights." In re S.B., 174 Vt. 427, 430 (2002) (mem.). Father has not demonstrated that the court abused its discretion in terminating his parental rights. See, e.g., In re B.M., 165 Vt. at 200 (holding that court did not err in terminating father's parental rights at initial disposition where father failed to ameliorate circumstances that led to CHINS petition despite availability of supports and having "significant amount of time" to do so).

Parents have not identified any grounds to disturb the merits or termination orders.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

Christina E. Nolan, Associate Justice

Michael P. Drescher, Associate Justice